[No. B198100. Second Dist., Div. Seven. Jan. 3, 2008.]

GENLYTE GROUP, LLC, et al., Petitioners, v.
WORKERS' COMPENSATION APPEALS BOARD and MARIA ZAVALA,
Respondents.

708

**COUNSEL**

Parker, Kern, Nard & Wenzel and Jeffrey Lemasters Tahir for Petitioners.

Law Offices of Moga & Hurley and Michael J. Hurley for Respondent Maria Zavala.

No appearance for Respondent Workers' Compensation Appeals Board.

OPINION

**PERLUSS, P. J.**—As part of its 2004 comprehensive reform of the workers' compensation laws, the Legislature required a change in the schedule by which permanent disability is rated. Labor Code section 4660, subdivision (d) (section 4660(d)),[1] provides the new schedule applies to all compensable claims arising on or after January 1, 2005, as well as to compensable claims arising before January 1, 2005, "when there has been either no comprehensive medical-legal report or no report by a treating physician indicating the existence of permanent disability, or when the employer is not required to provide the notice required by Section 4061 to the injured worker."

■ Must a comprehensive medical-legal report or treating physician's report state the injured worker's condition has reached permanent and stationary status to indicate the existence of permanent disability within the meaning of section 4660(d)? Neither the plain meaning of the statutory language nor the legislative history of section 4660(d) supports that conclusion, which would be at odds with the general mandate to construe workers' compensation statutes liberally in favor of extending benefits to injured workers. (§ 3202.) Accordingly, we reject Genlyte Group, LLC's contention the Workers' Compensation Appeals Board (WCAB) should not have awarded Maria Zavala permanent disability benefits based on the 1997 schedule for rating permanent disabilities that was in effect prior to January 1, 2005, because neither a comprehensive medical-legal report nor a treating physician's report indicated Zavala, injured between 2001 and 2003, was permanent and stationary prior to January 1, 2005. Nonetheless, we annul the WCAB's award and remand the matter for it to determine whether one of the specified medical reports indicated, based on substantial evidence, the existence of permanent disability prior to January 1, 2005.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *Zavala's Injuries and Treatment*

Zavala, an assembler for Genlyte, sustained injuries to her shoulders, upper extremities and right hand at work on December 5, 2001 (a specific injury), and from August 2, 2002, through March 14, 2003 (cumulative injury). (See

---

[1] Statutory references are to the Labor Code.

§ 3208.1 ["[a]n injury may be either: (a) 'specific,' occurring as the result of one incident or exposure which causes disability or need for medical treatment; or (b) 'cumulative,' occurring as repetitive mentally or physically traumatic activities extending over a period of time, the combined effect of which causes any disability or need for medical treatment"].) At the time of Zavala's injuries St. Paul Travelers was Genlyte's workers' compensation insurance carrier.

Zavala obtained medical treatment from orthopedic surgeon Hamid Rahman, M.D., who diagnosed bilateral shoulder sprain with impingement syndrome, lateral epicondylitis, carpal tunnel syndrome and ulnar nerve neuritis. On October 28, 2003, Dr. Rahman performed right shoulder surgery, which included arthroscopic debridement of the rotator cuff tendon, subacromial bursectomy, anterior acromionectomy and excision of the coracoacromial ligament. A similar surgery was performed on Zavala's left shoulder by Dr. Rahman on April 27, 2004.

In a May 28, 2004 report Dr. Rahman requested authorization for bilateral carpal tunnel release and ulnar nerve transposition. In his September 14, 2004 report Dr. Rahman stated, "It is my opinion that permanent disability exists with respect to the patient's bilateral shoulder and bilateral upper extremity injuries, however, I will further determine the extent of permanent disability after further evaluations of the patient's condition"—a finding Dr. Rahman repeated in substantially identical form in an orthopedic reevaluation report dated October 13, 2004, a postoperative evaluation dated October 27, 2004, and a postoperative orthopedic reevaluation dated November 10, 2004. In his 2004 reports Dr. Rahman also indicated Zavala "will more than likely require vocational rehabilitation, but this will be determined after further evaluation."[2] In addition, Dr. Rahman's reports stated with regard to causation and apportionment, "I conclude that it is medically probable that the patient's disability is solely attributable to the injury of 12/5/01 and continuous trauma injury of 8/2/02–3/14/03, however, these issues will be further addressed at the time of the permanent and stationary evaluation."[3]

---

[2] Dr. Rahman performed the left carpal tunnel release with ulnar nerve transposition on October 19, 2004 and the right carpal tunnel release with ulnar nerve transposition on March 1, 2005.

[3] " 'Permanent and stationary status' is the point when the employee has reached maximal medical improvement, meaning his or her condition is well stabilized, and unlikely to change substantially in the next year with or without medical treatment." (Cal. Code Regs., tit. 8, § 9785, subd. (a)(8).) Permanent and stationary status also may be found "[w]hen the employee's condition has reached maximum improvement or it has become stationary for a reasonable period of time." (*Kopitske v. Workers' Comp. Appeals Bd.* (1999) 74 Cal.App.4th 623, 631 [88 Cal.Rptr.2d 216].) " 'Permanent and stationary status refers to medical rehabilitation from an injury, not ability to work.' " (*Harold v. Workers' Comp. Appeals Bd.* (1980) 100

In his report dated October 19, 2005 Dr. Rahman indicated Zavala was now permanent and stationary with work restrictions of no "very heavy lifting" or "strenuous over-head working activities" for the shoulders and no repetitive pushing and pulling and forceful gripping and grasping for the upper extremities. Dr. Rahman reported Zavala was unable to perform her job duties as an assembler and vocational rehabilitation was required. Dr. Rahman also reported permanent impairment for the shoulders and upper extremities under the schedule that went into effect on January 1, 2005, which converted to 30 percent whole person impairment under the applicable charts.

Genlyte obtained a qualified medical-legal evaluation from orthopedic surgeon Brent W. Miller, M.D. In a report dated April 12, 2004 Dr. Miller stated, "The patient was a picture of evolution with her upper extremity problems just getting significantly worse over time. This is a classic presentation. . . . [H]er diagnosis of bilateral upper extremity overuse syndrome has multiple component parts. [¶] . . . [¶] Certainly at this point, the patient is not permanent and stationary [and] . . . remains temporarily totally disabled pending her additional surgery. The patient will be a qualified injured worker, and will not return to assembly activity as this will only serve to aggravate and further accelerate her upper extremity overuse syndrome." Dr. Miller further reported, "At the present time, the presence of permanent impairment is expected, but rating is uncertain." Dr. Miller also summarized a comprehensive medical-legal report dated May 30, 2003 by Rodney A. Gabriel, M.D., in which Zavala was reported to be permanent and stationary with upper extremity work restrictions and in need of vocational rehabilitation.

In a report dated August 22, 2005, five and one-half months after Zavala's most recent operation, Dr. Miller indicated Zavala was now permanent and stationary. Dr. Miller reported permanent disability for the shoulders and upper extremities under the former schedule and 2 percent whole person impairment under the new, January 1, 2005 schedule. Dr. Miller also indicated Zavala was unable to return to her usual and customary job duties and required vocational rehabilitation. After reviewing Dr. Rahman's report of October 19, 2005, Dr. Miller revised the whole person impairment to 4 percent under the new schedule.

2. *Proceedings Before the Administrative Law Judge and the WCAB*

Zavala and Genlyte proceeded to trial before the workers' compensation administrative law judge (WCJ). The reports from Dr. Rahman and Dr. Miller

Cal.App.3d 772, 785 [161 Cal.Rptr. 508], quoting *Huston v. Workers' Comp. Appeals Bd.* (1979) 95 Cal.App.3d 856, 868 [157 Cal.Rptr. 355].)

were received into evidence, and Zavala testified regarding her medical treatment and disability. The WCJ issued her minutes of hearing and summary of evidence on July 10, 2006. The WCJ determined the industrial injuries resulted in 38 percent permanent disability under the former schedule and awarded $30,940 in indemnity. (Genlyte had argued under the new schedule Zavala's adjusted permanent disability was either 6 percent or 12 percent.) The WCJ also found Zavala was entitled to temporary disability indemnity until she became permanent and stationary on October 19, 2005 and denied Genlyte's claim of credit for overpayment of indemnity. In the opinion on decision the WCJ explained the findings and award were based on Zavala's credible and unrebutted testimony and Dr. Rahman's opinion. In addition, the WCJ concluded the former schedule in effect prior to January 1, 2005, applied to Zavala's claim because the April 12, 2004 report by Dr. Miller was a comprehensive medical-legal report within the exception of section 4660(d).[4]

Genlyte petitioned the WCAB for reconsideration, contending, as it had at trial, the new January 1, 2005 schedule should have been used to rate Zavala's permanent disability because Dr. Miller's comprehensive medical-legal report indicated Zavala was not permanent and stationary and, although permanent disability was expected, it did not currently exist as expressly required for Zavala to fall within this exception in section 4660(d). In addition, Genlyte asserted it was owed a $740.31 credit because the parties had stipulated there was a temporary disability indemnity overpayment of $315.92 and a $500 permanent disability advance had been paid.

In the report on reconsideration the WCJ explained the existence of a comprehensive medical-legal report dated prior to January 1, 2005 satisfied the requirement of section 4660(d) and Genlyte had provided no authority for its position the qualifying words "indicating the existence of permanent disability" in the section applied not only to a treating physician's report but also to a comprehensive medical-legal report. The WCJ noted her conclusion was directly supported by a WCAB panel decision on this question. The WCJ also stated credit for Genlyte's alleged overpayments is discretionary under

---

[4] The full text of section 4660(d) provides, "The schedule shall promote consistency, uniformity, and objectivity. The schedule and any amendment thereto or revision thereof shall apply prospectively and shall apply to and govern only those permanent disabilities that result from compensable injuries received or occurring on and after the effective date of the adoption of the schedule, amendment or revision, as the fact may be. For compensable claims arising before January 1, 2005, the schedule as revised pursuant to changes made in legislation enacted during the 2003–04 Regular and Extraordinary Sessions shall apply to the determination of permanent disabilities when there has been either no comprehensive medical-legal report or no report by a treating physician indicating the existence of permanent disability, or when the employer is not required to provide the notice required by Section 4061 to the injured worker."

section 4909[5] and she had determined it would be inappropriate and unfair to Zavala to grant credit in this case because Zavala had not contributed in any way to the cause of the alleged overpayment.

The WCAB adopted the WCJ's decision and report and denied Genlyte reconsideration on February 27, 2007. The WCAB stated Dr. Miller's April 12, 2004 comprehensive medical-legal report complied with section 4660(d) and the former schedule applied, "regardless of the fact that the report contained no indication of permanent disability," based on its en banc decision in *Baglione v. Hertz Car Sales* (2007) 72 Cal.Comp.Cases 86 (*Baglione I*).[6]

Genlyte and St. Paul Travelers petitioned for writ of review in this court, contending a comprehensive medical-legal report must indicate permanent disability exists before January 1, 2005 for the former schedule to apply under section 4660(d), permanent disability under section 4660(d) requires the injured worker's condition to have reached permanent and stationary status and Dr. Miller's April 12, 2004 report indicates only future, rather than existing, permanent disability. Genlyte also insists the WCAB erred in denying its request for credit for its overpayments to Zavala. We issued the writ of review on August 30, 2007 to resolve the issues of statutory interpretation raised by the parties.

---

[5] Section 4909 provides in part, "Any payment, allowance, or benefit received by the injured employee during the period of his incapacity, or by his dependents in the event of his death, which by the terms of this division was not then due and payable or when there is any dispute or question concerning the right to compensation, shall not, in the absence of any agreement, be an admission of liability for compensation on the part of the employer, but any such payment, allowance, or benefit may be taken into account by the appeals board in fixing the amount of the compensation to be paid."

[6] In *Baglione I, supra,* 72 Cal.Comp.Cases 86, a four-to-three en banc decision, the WCAB applied the "last antecedent rule" of statutory construction to the portion of section 4660(d) requiring application of the new schedule to permanent disabilities resulting from compensable claims arising before January 1, 2005 except "when there has been either no comprehensive medical-legal report or no report by a treating physician indicating the existence of permanent disability," and concluded the qualifying words "indicating the existence of permanent disability" applied only to the immediately preceding antecedent term, "report by a treating physician." Accordingly, the WCAB held the former schedule applies whenever there was a comprehensive medical-legal report before January 1, 2005, even if the report does not indicate the existence of permanent disability.

On petition for reconsideration in *Baglione v. Hertz Car Sales* (2007) 72 Cal.Comp.Cases 444 (*Baglione II*), another four-to-three en banc decision, the WCAB (which had a new member) reversed *Baglione I,* explaining the last antecedent rule was simply a tool for determining legislative intent and it was apparent the Legislature intended the words "indicating the existence of permanent disability" to apply to both comprehensive medical-legal reports and reports by a treating physician in order to extend the new schedule and the 2004 reform of the workers' compensation laws to as many cases as possible.

## DISCUSSION

### 1. *Standard of Review and the Rules of Statutory Construction*

Issues of statutory interpretation are questions of law subject to our independent or de novo review. (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432 [101 Cal.Rptr.2d 200, 11 P.3d 956]; see *California Veterinary Medical Assn. v. City of West Hollywood* (2007) 152 Cal.App.4th 536, 546 [61 Cal.Rptr.3d 318].) Nonetheless, unless clearly erroneous the WCAB's interpretation of the workers' compensation laws is entitled to great weight. (*Brodie v. Workers' Comp. Appeals Bd.* (2007) 40 Cal.4th 1313, 1331 [57 Cal.Rptr.3d 644, 156 P.3d 1100] (*Brodie*) [WCAB "has extensive expertise in interpreting and applying the workers' compensation scheme"]; *Ralphs Grocery Co. v. Workers' Comp. Appeals Bd.* (1995) 38 Cal.App.4th 820, 828 [45 Cal.Rptr.2d 197].)

■ "If the statutory language is unambiguous, 'we presume the Legislature meant what it said, and the plain meaning of the statute governs.' " (*People v. Toney* (2004) 32 Cal.4th 228, 232 [8 Cal.Rptr.3d 577, 82 P.3d 778]; see *People v. Loeun* (1997) 17 Cal.4th 1, 9 [69 Cal.Rptr.2d 776, 947 P.2d 1313] [" 'In interpreting statutes, we follow the Legislature's intent, as exhibited by the plain meaning of the actual words of the law . . . .' "]; *Murillo v. Fleetwood Enterprises, Inc.* (1998) 17 Cal.4th 985, 990 [73 Cal.Rptr.2d 682, 953 P.2d 858] [in resolving questions of statutory interpretation, the court "must attempt to effectuate the probable intent of the Legislature, as expressed through the actual words of the statutes in question"; the first step " ' "is to scrutinize the actual words of the statute, giving them a plain and commonsense meaning" ' "]; *DuBois v. Workers' Comp. Appeals Bd.* (1993) 5 Cal.4th 382, 387–388 [20 Cal.Rptr.2d 523, 853 P.2d 978]; *Moyer v. Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224].)

■ Interpretation of the statutory language should be consistent and harmonized with the purpose of the statutory framework for workers' compensation as a whole. (See *Brodie, supra,* 40 Cal.4th at p. 1328; *DuBois v. Workers' Comp. Appeals Bd., supra,* 5 Cal.4th at p. 388; *Moyer v. Workmen's Comp. Appeals Bd., supra,* 10 Cal.3d at p. 230.) Pursuant to section 3202, the workers' compensation laws are to be "liberally construed by the courts with the purpose of extending their benefits for the protection of persons injured in the course of their employment." (See generally *Arriaga v. County of Alameda*

(1995) 9 Cal.4th 1055, 1065 [40 Cal.Rptr.2d 116, 892 P.2d 150].) However, liberal construction under "[s]ection 3202 is [only] a tool for resolving statutory ambiguity where it is not possible through other means to discern the Legislature's actual intent." (*Brodie*, at p. 1332.)

## 2. *The Legislature's 2004 Reform of the Workers' Compensation Laws*

In 2004 the Legislature enacted a comprehensive reform of the workers' compensation system. (See *Brodie, supra*, 40 Cal.4th at p. 1323.) Senate Bill No. 899 (2003–2004 Reg. Sess.) was an urgency measure "designed to alleviate a perceived crisis in skyrocketing workers' compensation costs." (*Brodie*, at p. 1329; see Stats. 2004, ch. 34, § 49 [bill urgency measure needed "to provide relief to the state from the effects of the current workers' compensation crisis at the earliest possible time"].)

As part of its reform package the Legislature amended section 4660 to require regular revisions of the permanent disability rating schedule.[7] A new rating schedule incorporating the American Medical Association Guides to the Evaluation of Permanent Impairment (5th ed.) went into effect on January 1, 2005, superseding the 1997 schedule in effect when Zavala was injured. (Cal. Code Regs., tit. 8, § 9805; see *Energetic Painting & Drywall, Inc. v. Workers' Comp. Appeals Bd.* (2007) 153 Cal.App.4th 633, 636 [63 Cal.Rptr.3d 210]; *Zenith Ins. Co. v. Workers' Comp. Appeals Bd.* (2007) 153 Cal.App.4th 461, 464 [62 Cal.Rptr.3d 683].)[8] In many cases, including the case at bar,[9]

---

[7] "Permanent disability payments are calculated by first expressing the degree of permanent disability as a percentage and then converting that percentage into an award based on a table." (*Brodie, supra*, 40 Cal.4th at p. 1320, fn. omitted.) The percentage of disability is also referred to as a "rating." (See *Vera v. Workers' Comp. Appeals Bd.* (2007) 154 Cal.App.4th 996, 1000, fn. 1 [65 Cal.Rptr.3d 151].) As the Supreme Court recently explained, the rating or percentage level of disability represents " 'only a point on a relative scale.' [Citation.] Thus, a rating of 50 percent has no real world significance, other than to indicate that the injured worker is more disabled than someone with a 45 percent rating and less disabled than someone with a 55 percent rating." (*Brodie*, at p. 1320, fn. 4.)

[8] Section 4660 provides in part, "(a) In determining the percentages of permanent disability, account shall be taken of the nature of the physical injury or disfigurement, the occupation of the injured employee, and his or her age at the time of the injury, consideration being given to an employee's diminished future earning capacity. [¶] (b)(1) For purposes of this section, the 'nature of the physical injury or disfigurement' shall incorporate the descriptions and measurements of physical impairments and the corresponding percentages of impairments published in the American Medical Association (AMA) Guides to the Evaluation of Permanent Impairment (5th Edition)."

[9] Genlyte asserts application of the new January 1, 2005 schedule would result in a disability rating, after adjustments, of 12 percent based on Dr. Rahman's opinion or 6 percent based on Dr. Miller's opinion, in contrast to the 38 percent permanent disability rating under the former schedule found by the WCJ and adopted by the WCAB.

the revision to the schedule for rating permanent disabilities reduces the amount a worker will be compensated for a permanent disability. (See, e.g., *Vera v. Workers' Comp. Appeals Bd., supra*, 154 Cal.App.4th at p. 1000 (*Vera*) [new schedule results in permanent disability rating of 26 percent; former schedule results in rating of 59 percent].)

 The Legislature specifically provided the new schedule, which became effective January 1, 2005, applies prospectively (§ 4660(d)) and defines "prospectively" to include any worker whose permanent disability results from compensable injuries received or occurring on or after January 1, 2005, as well as workers whose compensable claims arose before January 1, 2005 "when there has been either no comprehensive medical-legal report or no report by a treating physician indicating the existence of permanent disability, or when the employer is not required to provide the notice required by Section 4061 to the injured worker." (*Ibid.*) "[W]hen any of the[] three circumstances [described in the final sentence of section 4660(d)] have occurred before January 1, 2005, the percentage of permanent disability will be calculated using the earlier schedule that was in effect on the date of the injury." (*Costco Wholesale Corp. v. Workers' Comp. Appeals Bd.* (2007) 151 Cal.App.4th 148, 152 [59 Cal.Rptr.3d 611] (*Costco*); see *Energetic Painting & Drywall, Inc. v. Workers' Comp. Appeals Bd., supra*, 153 Cal.App.4th at p. 636; *Chang v. Workers' Comp. Appeals Bd.* (2007) 153 Cal.App.4th 750, 753 [63 Cal.Rptr.3d 219] [schedule effective Jan. 1, 2005, applies to pending matters regardless of date of injury unless exception under § 4660(d) applies].)

3. *A Comprehensive Medical-legal Report Must Indicate the Existence of Permanent Disability to Satisfy Section 4660(d)'s Exception to Application of the New Schedule*

The WCAB based its decision to use the former permanent disability rating schedule on the existence of a comprehensive medical-legal report prior to January 1, 2005 (Dr. Miller's April 12, 2004 report) without regard to whether that report indicated the existence of permanent disability. That determination was consistent with the WCAB's en banc decision in *Baglione I, supra*, 72 Cal.Comp.Cases 86, which utilized the last antecedent rule of statutory construction[10] to interpret the participial clause "indicating the existence of permanent disability" in section 4660(d) as modifying (that

---

[10] The last antecedent rule provides, in general, that " 'qualifying words, phrases and clauses are to be applied to the words or phrases immediately preceding and are not to be construed as extending to or including others more remote.' " (*White v. County of Sacramento* (1982) 31 Cal.3d 676, 680 [183 Cal.Rptr. 520, 646 P.2d 191].)

is, limiting) the immediately preceding object "report by a treating physician" but not the more distant object "comprehensive medical-legal report." The WCAB itself in *Baglione II, supra,* 72 Cal.Comp.Cases 444, and each of the Courts of Appeal that has considered the question have rejected that narrow reading of section 4660(d). (See, e.g., *Costco, supra,* 151 Cal.App.4th at pp. 154–155; *Zenith Ins. Co. v. Workers' Comp. Appeals Bd., supra,* 153 Cal.App.4th at p. 465.)

█ In *Costco, supra,* 151 Cal.App.4th at page 154, the court observed the last antecedent rule was not applicable when the natural construction of the language demands the clause be read as applicable to the first and other words, as well as to the last, or when the sense of the entire statute requires a qualifying word or phrase apply to several preceding words. Those exceptions to a rigid or mechanical application of the last antecedent rule, the court explained, are simply another way of stating the fundamental rule that a court is to construe a statute to effectuate the purpose of the law. (*Ibid.*; see *White v. County of Sacramento, supra,* 31 Cal.3d at p. 681.) █ Reading section 4660 as a whole, the *Costco* court concluded the Legislature intended to require "implementation of the new permanent disability rating schedule be tied to an actual indication of permanent disability prior to the statute's effective date. It follows that the requirement of an indication of permanent disability would apply to medical-legal reports as well as to reports prepared by a treating physician." (*Costco,* at p. 154; accord, *Zenith Ins. Co. v. Workers' Comp. Appeals Bd., supra,* 153 Cal.App.4th at p. 465 [interpreting § 4660(d) to permit use of the former schedule based on a comprehensive medical-legal report that did not indicate the existence of permanent disability "would violate the Legislature's intent to bring as many cases as possible under the new workers' compensation law and would render nugatory the other two exceptions under section 4660, subdivision (d)"].)

In addition, as also noted by the Court of Appeal in *Costco,* the "missing comma" that was the basis for the WCAB's decision in *Baglione I*—that is, a comma before the clause "indicating the existence of permanent disability," as well as after the clause, which would have clearly indicated the Legislature's intent to qualify both the report of a treating physician and the comprehensive medical-legal report—is present in section 4658,[11] a parallel

---

[11] Section 4658, subdivision (d)(4), provides, "For compensable claims arising before April 30, 2004, the schedule provided in this subdivision shall not apply to the determination of permanent disabilities when there has been either a comprehensive medical-legal report or a report by a treating physician, indicating the existence of permanent disability, or when the employer is required to provide the notice required by Section 4061 to the injured worker."

provision of the workers' compensation law that also pertains to the computation of permanent disability payments. (See *Costco, supra*, 151 Cal.App.4th at p. 155.) "There would be no reason for the Legislature to have a different type of medical-legal report serve as the demarcation for permanent disability ratings and permanent disability compensation schedules." (*Ibid.*)

■ We agree with the reasoning of *Costco, supra*, 151 Cal.App.4th 148, and, accordingly, hold under section 4660(d) a comprehensive medical-legal report, like a treating physician's report, must contain an indication of the existence of permanent disability to trigger use of the pre-2005 rating schedule.[12]

 4. *The Injured Worker's Condition Need Not Be Permanent and Stationary for the Treating Physician or Comprehensive Medical-legal Report to Indicate the Existence of Permanent Disability*

Zavala's condition was not yet permanent and stationary at the time of Dr. Miller's April 12, 2004 comprehensive medical-legal report or Dr. Rahman's 2004 treating physician reports: Her injuries reached permanent and stationary status by October 19, 2005 according to Dr. Rahman and the WCJ. Genlyte contends the Legislature used the term "permanent disability" in section 4660(d) to mean a ratable disability where the injured worker has reached permanent and stationary status and, therefore, to come within section 4660(d)'s exception to application of the new, 2005 schedule, either the treating physician's report or the comprehensive medical-legal report must indicate the injured worker's condition is permanent and stationary prior to January 1, 2005. Under this construction of the statute, the new schedule would necessarily apply to Zavala's permanent disability.

Genlyte's position is supported by *Vera, supra*, 154 Cal.App.4th 996, which asserted the terms "permanent disability" and "permanent and stationary status" are used interchangeably in the applicable administrative regulations and therefore concluded it was appropriate to presume the Legislature

---

[12] As discussed, in *Baglione II, supra*, 72 Cal.Comp.Cases 444, the WCAB reversed its decision in *Baglione I, supra*, 72 Cal.Comp.Cases 86, and held the Legislature intended the words "indicating the existence of permanent disability" in section 4660(d) to apply to both comprehensive medical-legal reports and reports by a treating physician. Although not binding on this court, the WCAB's contemporaneous interpretation of the workers' compensation laws is appropriately considered in construing the statute. (See *Brodie, supra*, 40 Cal.4th at p. 1331; *Smith v. Workers' Comp. Appeals Bd.* (2000) 79 Cal.App.4th 530, 537, fn. 2 [94 Cal.Rptr.2d 186].)

was aware of that interchangeable use when it drafted section 4660(d). (*Vera*, at p. 1007.) In addition, the *Vera* court explained the treating physician under the regulatory scheme normally issues a report evaluating the extent of the employee's impairment as relevant to the employee's permanent disability rating after, not before, he or she has made a determination the employee's status is permanent and stationary. (*Id.* at p. 1006.) Accordingly, the court held the Legislature intended the former schedule to apply to a claim arising before January 1, 2005 only when a treating physician's report indicates the claimant's condition has reached the status of permanent and stationary. (*Id.* at p. 1008.)

■ Genlyte's argument and the *Vera* court's conclusion miss the mark: The Legislature has repeatedly demonstrated its ability to specify "permanent and stationary status" when that is what it intends. (See, e.g., §§ 4658, subd. (d)(2) [providing for increase or decrease of permanent disability indemnity depending on whether employer offers injured employee regular, modified or alternative work "within 60 days of a disability becoming permanent and stationary"], 4061, subd. (a)(2) [specifying required notice upon last payment of temporary disability indemnity when amount of permanent disability indemnity payable cannot be determined "because the employee's medical condition is not yet permanent and stationary"].) It did not do so in section 4660(d): "We are reluctant to conclude that the Legislature's use of different terms, at different times in the statutory scheme, is meaningless." (*In re Zacharia D.* (1993) 6 Cal.4th 435, 451 [24 Cal.Rptr.2d 751, 862 P.2d 751]; see *Villa De Las Palmas Homeowners Assn. v. Terifaj* (2004) 33 Cal.4th 73, 82 [14 Cal.Rptr.3d 67, 90 P.3d 1223] [if there is no ambiguity in the language of statute, Legislature is presumed to have meant what it said].) Moreover, the exceptions in section 4660(d) are broadly worded and include *any* comprehensive medical-legal or treating physician's report "indicating the existence of permanent disability." The language of the statute is not limited to what the *Vera* court properly describes as the typical final or permanent and stationary report.

■ "Permanent disability," although not defined in the Labor Code (see *General Foundry Service v. Workers' Comp. Appeals Bd.* (1986) 42 Cal.3d 331, 334 [228 Cal.Rptr. 243, 721 P.2d 124] (*General Foundry*), is a term with historical meaning in workers' compensation jurisprudence. Permanent disability is the impairment of earning capacity, impairment of the normal use of a body member or function or a competitive handicap in the open labor market. (*State Compensation Ins. Fund v. Industrial Acc. Com.* (1963) 59 Cal.2d 45, 52 [27 Cal. Rtpr. 7020, 377 P.2d 902] [subsequent injury with

overlapping permanent disability to different body parts compensable to extent alters earning capacity or ability to compete in labor market]; *Luchini v. Workmen's Comp. App. Bd.* (1970) 7 Cal.App.3d 141, 145 [86 Cal.Rptr. 453] [prophylactic work restriction basis for permanent disability]; *J. T. Thorp, Inc. v. Workers' Comp. Appeals Bd.* (1984) 153 Cal.App.3d 327, 336 [200 Cal.Rptr. 219] [medical claim for asbestos exposure even though no temporary or permanent disability or date of injury triggering statute of limitations; permanent disability awarded when manifest].)

To be sure, normally when permanent and stationary status is achieved, the extent of ratable permanent disability is reported (*Vera, supra,* 154 Cal.App.4th at p. 1006; § 4060 et seq.; Cal. Code Regs., tit. 8, §§ 9785, subd. (g), 10606); temporary disability indemnity ends if the injured worker has not already returned to work; and the right to permanent disability indemnity arises. (*Department of Rehabilitation v. Workers' Comp. Appeals Bd.* (2003) 30 Cal.4th 1281, 1291–1292 [135 Cal.Rptr.2d 665, 70 P.3d 1076]; *LeBoeuf v. Workers' Comp. Appeals Bd.* (1983) 34 Cal.3d 234, 238 [193 Cal.Rptr. 547, 666 P.2d 989]; *Edgar v. Workers' Comp. Appeals Bd.* (1998) 65 Cal.App.4th 1, 10–11 [76 Cal.Rptr.2d 83].) However, in an appropriate case a physician is not precluded from reporting that permanent disability exists prior to the time the injured worker has reached permanent and stationary status or the extent of ratable permanent disability is known. Section 4061, which pertains to the third (notice) exception for pre-January 1, 2005 compensable claims included in section 4660(d)—an exception not at issue in this case[13]—requires notice by the employer together with the last payment of temporary disability indemnity that (i) no permanent disability indemnity is payable, (ii) the amount that is payable or (iii) "that permanent disability indemnity may be or is payable, but that the amount cannot be determined because the employee's medical condition is not yet permanent and stationary."[14] If temporary disability indemnity payments have terminated and the

[13] Notice under section 4061 was not required in this case until the last payment of temporary disability indemnity to Zavala on September 10, 2005, well after the January 1, 2005 effective date for the new schedule in section 4660(d). (See *Costco, supra,* 151 Cal.App.4th at pp. 156–157 [third exception in § 4660(d) applies when an employer has been required to give notice under § 4061 prior to 2005 concerning its intentions regarding payment of permanent disability indemnity; duty arises when temporary disability payments are terminated, not when they are commenced]; *Zenith Ins. Co. v. Workers' Comp. Appeals Bd., supra,* 153 Cal.App.4th at pp. 465–466 [same]; *Pendergrass v. Duggan Plumbing* (2007) 72 Cal.Comp.Cases 456 [same].)

[14] Section 4061 provides, "(a) Together with the last payment of temporary disability indemnity, the employer shall . . . provide the employee one of the following: [¶] (1) Notice either that no permanent disability indemnity will be paid . . . or notice of the amount of permanent disability indemnity determined by the employer to be payable. . . . [¶] (2) Notice that permanent disability indemnity may be or is payable, but that the amount cannot be determined because the employee's medical condition is not yet permanent and stationary. The notice shall advise the employee that his or her medical condition will be monitored until it is

employer recognizes permanent disability is payable but in an as yet undeterminable amount, that can only be because permanent disability exists but the worker's condition is not yet permanent and stationary.

Similarly, the claims administrator must provide notice of permanent disability indemnity that is or may be payable even though the employee is not yet permanent and stationary under California Code of Regulations, title 8, section 9812, subdivision (g)(1), which states, "If the injury has resulted or may result in *permanent disability* but the employee's medical condition is *not permanent and stationary*, the claims administrator shall advise the employee together with the last payment of temporary disability indemnity, that permanent disability is or may be payable but that the amount cannot be determined because the employee's medical condition has not yet reached a stationary status." (Italics added.) Thus, it is simply not the case that the two terms are invariably used interchangeably or that we should necessarily conclude the Legislature intended "permanent and stationary" when it actually said "permanent disability."

Recognizing permanent disability may exist before permanent and stationary status has been reached under the statutory scheme, moreover, is fully consistent with existing case law. In instances of insidious and progressive occupational diseases—for example, from exposure to asbestos—permanent disability may be rated and indemnity advances ordered before the employee is permanent and stationary; jurisdiction is reserved pending permanent and stationary status or permanent total disability. (*General Foundry, supra,* 42 Cal.3d at pp. 333, 338; *Chavira v. Workers' Comp. Appeals Bd.* (1991) 235 Cal.App.3d 463, 473 [286 Cal.Rptr. 600].)[15] Permanent disability before

permanent and stationary, at which time the necessary evaluation will be performed to determine the existence and extent of permanent impairment and limitations for the purpose of rating permanent disability and to determine the need for continuing medical care, or at which time the employer will advise the employee of the amount of permanent disability indemnity the employer has determined to be payable."

[15] Quoting the then applicable administrative regulation (former Cal. Admin. Code, tit. 8, § 9735), which provided "[a] disability is considered permanent after the employee has reached maximum improvement or his condition has been stationary for a reasonable period of time," the Supreme Court in *General Foundry* held "[t]his definition is inadequate . . . when applied to a progressive occupational disease." (*General Foundry, supra,* 42 Cal.3d at p. 335.) The current regulatory definition of permanent disability (Cal. Code Regs., tit. 8, § 10152) is substantially the same: "A disability is considered permanent when the employee has reached maximal medical improvement, meaning his or her condition is well stabilized, and unlikely to change substantially in the next year with or without medical treatment." The Court of Appeal in *Vera, supra,* 154 Cal.App.4th at page 1007, noted the same language is used in the portion of the regulations setting forth a treating physician's reporting duties with regard to "permanent and stationary status" (see Cal. Code Regs., tit. 8, § 9785, subd. (a)(8) [quoted in fn. 3, *ante*]) and suggested use of identical definitions in the regulations reinforced its holding the Legislature meant "permanent and stationary" when it said "permanent disability." In light of

permanent and stationary status may also be found in cases involving serious injuries such as severe burns or the loss of sight or limbs. (E.g., *Tarr v. Industrial Acc. Com.* (1958) 164 Cal.App.2d 834, 835–836 [331 P.2d 417] [deafness that will not lessen permanent disability even though not permanent and stationary]; *Dahlbeck v. Industrial Acc. Com.* (1955) 135 Cal.App.2d 394, 399–401 [287 P.2d 353] [disability from burns over body not permanent and stationary combined with subsequent injury disability].)

■■■ That permanent disability may exist prior to the worker's condition reaching permanent and stationary status is also illustrated by the role of vocational rehabilitation benefits in the workers' compensation scheme for injuries prior to January 1, 2004. (See § 139.5.)[16] Vocational rehabilitation provides training to enable an injured worker to respond to the impairment of earning capacity or competitive handicap in the open labor market caused by his or her injury—that is, permanent disability—and to return to the workforce as soon as practicable: "to 'restore the worker to suitable employment.' " (*Moyer v. Workmen's Comp. Appeals Bd.*, *supra*, 10 Cal.3d at p. 232; see *Kopitske v. Workers' Comp. Appeals Bd.*, *supra*, 74 Cal.App.4th at p. 630.) Vocational rehabilitation is properly initiated as soon as it is apparent the worker will not be able to return to his or her original job duties and ideally before a permanent and stationary status is achieved. (See *Webb v. Workers' Comp. Appeals Bd.* (1980) 28 Cal.3d 621, 627 [170 Cal.Rptr. 32, 620 P.2d 618].) Of necessity, that point is before a final decision can be reached on the nature and extent of his or her permanent disability. (See *LeBoeuf v. Workers' Comp. Appeals Bd.*, *supra*, 34 Cal.3d at p. 242; see also *General Foundry*, *supra*, 42 Cal.3d at p. 339 ["an injury should not be deemed permanent and stationary until an employee is both medically and vocationally rehabilitated"].) Therefore, a recommendation for vocational rehabilitation before the worker's condition reaches permanent and stationary status, as in this case and as frequently occurs, suggests the existence of permanent disability prior to the injured worker's condition reaching permanent and stationary status. (See *LeBoeuf*, at pp. 242–246; *General Foundry*, at pp. 339–340.)

---

the Supreme Court's conclusion the regulatory definition of permanent disability is "inadequate" to cover all cases of permanent disability, we find the *Vera* court's analysis on this point unpersuasive.

[16] As discussed, Zavala's injuries occurred prior to 2004. Both Dr. Rahman and Dr. Miller indicated in their 2004 reports that Zavala would require vocational rehabilitation.

5. *Remand Is Necessary to Determine if Dr. Miller's April 12, 2004 Comprehensive Medical-legal Report or Dr. Rahman's Treating Physician Reports Indicate the Existence of Permanent Disability Prior to January 1, 2005*

Relying on its now superseded decision in *Baglione I, supra*, 72 Cal.Comp.Cases 86, in its decision after reconsideration affirming the WCJ's December 8, 2006 findings and award and order, the WCAB agreed with the finding Dr. Miller's April 12, 2004 comprehensive medical-legal report triggered the section 4660(d) exception to use of the new schedule "regardless of the fact that the report contained no indication of permanent disability." (As discussed, Dr. Miller stated in part, "At the present time, the presence of permanent impairment is expected, but rating is uncertain.") However, under *Baglione I* the WCAB had no reason to fully examine Dr. Miller's report to determine whether it indicated[17] permanent disability at that time since any such finding was irrelevant to the issue before it. Similarly, in light of the WCJ's and WCAB's conclusions the former schedule applied because a comprehensive medical-legal report had been prepared prior to January 1, 2005, there was no occasion to determine whether Dr. Rahman's 2004 reports, which clearly stated permanent disability existed, are substantial evidence supporting use of the former schedule. (See *State Comp. Ins. Fund v. Workers' Comp. Appeals Bd.* (2007) 146 Cal.App.4th 1311, 1315 [53 Cal.Rptr.3d 568] [new schedule applies when physician's statement that permanent disability from injury existed in 2004 was not supported by previous reports or substantial evidence].)[18]

---

[17] The primary definition of "indicate" in the Oxford English Dictionary is "to point out, point to, make known, show" (Oxford English Dict. Online <http://www.oed.com/> [as of Jan. 3, 2008]) and in Webster's 10th New Collegiate Dictionary (1995) at page 592, "to point out or point to." Nothing in section 4660(d) or its legislative history suggests the Legislature intended "indicating" to have anything other than its usual or ordinary meaning. Accordingly, a report "indicating" the existence of permanent disability is one that states, rather than merely suggests, there currently is permanent disability. (See *DuBois v. Workers' Comp. Appeals Bd., supra*, 5 Cal.4th at p. 388 [statutory language must be considered in context of entire statutory scheme, giving effect to the statutes " ' "according to the usual, ordinary import of the language employed in framing them" ' "].)

[18] The WCAB's findings must be supported by substantial evidence (§ 5952, subd. (d)), which generally means evidence that is credible, reasonable and of solid value that a reasonable mind might accept as probative on the issues and adequate to support a conclusion. (*Braewood Convalescent Hospital v. Workers' Comp. Appeals Bd.* (1983) 34 Cal.3d 159, 164 [193 Cal.Rptr. 157, 666 P.2d 14].) A factual finding, order, decision or award is not based on substantial evidence if unreasonable, illogical, arbitrary, improbable or inequitable considering the entire record and statutory scheme. (*Western Growers Ins. Co. v. Workers' Comp. Appeals Bd.* (1993) 16 Cal.App.4th 227, 233 [20 Cal.Rptr.2d 26]; *Bracken v. Workers' Comp. Appeals Bd.* (1989) 214 Cal.App.3d 246, 254 [262 Cal.Rptr. 537].) Similarly, a medical expert's opinion or report that is based on incorrect or inadequate facts, conjecture or an erroneous examination or legal theory or that is beyond the physician's expertise is not substantial evidence. (*Place v. Workmen's Comp. App. Bd.* (1970) 3 Cal.3d 372, 378 [90 Cal.Rptr. 424,

The WCAB has extensive experience and expertise in interpreting and applying the workers' compensation laws and is charged with their administration. (See *Brodie, supra,* 40 Cal.4th at p. 1331.) Accordingly, we remand the matter to the WCAB to determine whether Dr. Miller's April 12, 2004 comprehensive medical-legal report or Dr. Rahman's 2004 treating physician reports are substantial evidence "indicating the existence of permanent disability" under section 4660(d) and, based on that determination, to apply either the former schedule or the new schedule in issuing an award to Zavala.

### 6. *Genlyte's Claim of Credit Should Be Reevaluated on Remand*

Section 4909 provides, in part, "Any payment, allowance, or benefit received by the injured employee . . . which by the terms of this division was not then due and payable . . . may be taken into account by the appeals board in fixing the amount of the compensation to be paid." Genlyte and Zavala apparently agree Genlyte overpaid temporary disability indemnity benefits, although they disagree as to the precise amount ($254.69, $315.92 & $740.31, as well as other figures are referred to at different points in the parties' appellate papers), and seem to agree Genlyte paid a one-time permanent disability advance of $500 as to which Genlyte is also entitled to credit. Nonetheless, the WCJ denied Genlyte's claim for credit on the ground it would be unfair to Zavala because she was not in any way responsible for the overpayments.

Although we agree the WCAB generally has some degree of discretion to grant or deny credit for overpayments under section 4909 (see, e.g., *Herrera v. Workmen's Comp. App. Bd.* (1969) 71 Cal.2d 254, 258 [78 Cal.Rptr. 497, 455 P.2d 425] [award of credit against temporary disability indemnity discretionary where employer paid wages voluntarily]), on this record we are unable to determine the actual amount of overpayments made by Genlyte (the WCJ did not specifically address the varying amounts asserted by the parties or included in their pretrial stipulations) or assess the relative equities in either recognizing or denying full or partial credit. Accordingly, the issue of credit should be reevaluated on remand.

---

475 P.2d 656]; *Garza v. Workmen's Comp. App. Bd.* (1970) 3 Cal.3d 312, 317 [90 Cal.Rptr. 355, 475 P.2d 451]; *Zemke v. Workmen's Comp. App. Bd.* (1968) 68 Cal.2d 794, 798 [69 Cal.Rptr. 88, 441 P.2d 928].)

## DISPOSITION

The decision of the WCAB is annulled and the matter remanded to determine which schedule applies and for further proceedings not inconsistent with this opinion. The parties are to bear their own costs on appeal.

Woods, J., and Zelon, J., concurred.