[No. A126344. First Dist., Div. Three. July 29, 2011.]

WANDA OGILVIE, Petitioner, v.
WORKERS' COMPENSATION APPEALS BOARD and CITY AND
COUNTY OF SAN FRANCISCO, Respondents.

[No. A126427. First Dist., Div. Three. July 29, 2011.]

CITY AND COUNTY OF SAN FRANCISCO, Petitioner, v.
WORKERS' COMPENSATION APPEALS BOARD and
WANDA OGILVIE, Respondents.

## COUNSEL

Law Office of Joseph C. Waxman, Joseph C. Waxman; Gearheart & Otis and Mark E. Gearheart for Petitioner Wanda Ogilvie.

William A. Herreras for California Applicants' Attorneys Association as Amicus Curiae on behalf of Petitioner Wanda Ogilvie.

Herbert I. Higgins, Jr., in pro. per., as Amicus Curiae on behalf of Petitioner Wanda Ogilvie.

Dennis J. Herrera, City Attorney, Dyana M. Lechuga, Peter Scherr and Danny Yeh Chou, Deputy City Attorneys, for Petitioner City and County of San Francisco.

David M. Skaggs for Pacific Compensation Insurance Company as Amicus Curiae on behalf of Petitioner City and County of San Francisco.

Vanessa L. Holton, Steven A. McGinty and Jesse N. Rosen for John C. Duncan, Director of Industrial Relations as Amicus Curiae on behalf of Petitioner City and County of San Francisco.

Adam M. Cole, Richard G. Krenz and Christopher Citko for Steve Poizner, California Insurance Commissioner as Amicus Curiae on behalf of Petitioner City and County of San Francisco.

Law Offices of Saul Allweiss and Michael A. Marks for California Workers' Compensation Institute as Amicus Curiae on behalf of Petitioner City and County of San Francisco.

Finnegan, Marks, Theofel & Desmond and Ellen Sims Langille for California Chamber of Commerce as Amicus Curiae on behalf of Petitioner City and County of San Francisco.

Suzanne Ah-Tye, Patricia Brown Hein, David M. Goi and Christopher S. Chen for State Compensation Insurance Fund as Amicus Curiae on behalf of Petitioner City and County of San Francisco.

Neil P. Sullivan and Vincent Bausano for Respondents.

## OPINION

**SIGGINS, J.**—Labor Code section 4660, subdivision (c)[1] provides that the California permanent disability rating schedule (rating schedule) is "prima facie evidence" of the percentage of permanent disability to be attributed to an employee's work-related injury in a workers' compensation case. The core issue presented here is: What showing is required by an employee who contests a scheduled rating on the basis that the employee's diminished future earning capacity is different than the earning capacity used to arrive at the scheduled rating? Because we cannot conclude on this record whether Wanda Ogilvie effectively rebutted application of the rating schedule, we reverse the decision of the Workers' Compensation Appeals Board (WCAB), annul the award of benefits to Ogilvie, and remand for further proceedings consistent with our opinion.

### FACTUAL AND PROCEDURAL BACKGROUND

#### *Injury*

Ogilvie worked for the City and County of San Francisco (CCSF) as a "Muni" bus driver for 17 years. On April 1, 2004, the bus Ogilvie was

---

[1] All further statutory references are to the Labor Code unless otherwise noted.

driving broke down and needed to be towed back to the repair yard. Ogilvie rode inside the bus while it was being towed. As a result of being jostled about during the ride, Ogilvie hurt her back and right knee. After the condition of her knee continued to deteriorate, Ogilvie underwent knee replacement surgery in May 2006. A spine surgeon had also recommended that Ogilvie undergo spinal fusion surgery, but Ogilvie declined. She never returned to work. She filed for workers' compensation benefits.

Roughly three years after her injury, Ogilvie applied for a disability retirement. In reviewing her application, the retirement office told Ogilvie that taking a service retirement, rather than disability retirement, would be a better financial decision. So she took it. Around this time, two qualified medical examiners, one selected by Ogilvie and one selected by the CCSF, evaluated Ogilvie to determine her permanent disability rating. As a compromise between the two medical examiners' evaluations, the parties stipulated before the workers' compensation judge (WCJ) that for Ogilvie's injury the rating schedule under section 4660, as amended by Senate Bill No. 899 (2003–2004 Reg. Sess.), yields a permanent disability rating of 28 percent, as adjusted due to her diminished future earning capacity, age, occupation, and apportionment for nonindustrial and preexisting disability.

### *Proceedings Before the WCJ*

In a trial before the WCJ, Ogilvie sought to rebut the 28 percent scheduled rating. Each party submitted an estimate of Ogilvie's diminished future earning capacity from a vocational rehabilitation expert who essentially compared Ogilvie's earnings before her injury with what she could be expected to earn after it. Each expert considered his evaluation to be superior to the scheduled rating because he considered such things as Ogilvie's education, skills, motivation, local job market conditions, work history, and vocational testing in arriving at Ogilvie's loss of earning capacity. Ogilvie contended that the opinions of both experts effectively rebutted the application of the scheduled rating and supported her claim to a permanent disability rating greater than 28 percent. The WCJ agreed based on the fact that the permanent disability indemnity associated with the 28 percent rating was less than Ogilvie's actual diminished future earning capacity calculated by either vocational expert.[2] Since a scheduled award of benefits would not sufficiently compensate Ogilvie for her diminished future earning capacity, the WCJ set about devising an alternative way to calculate Ogilvie's award. The WCJ

---

[2] The vocational experts estimated that Ogilvie had between a 51 and 53 percent loss of earning capacity.

employed three different methodologies.[3] After considering these methodologies, the WCJ settled upon a final permanent disability rating of 40 percent after taking into account Ogilvie's prior and non-work-related injuries. The CCSF filed a petition for reconsideration.

## Proceedings Before the WCAB

On February 3, 2009, the WCAB issued its en banc decision holding that Ogilvie could rebut the diminished future earning capacity adjustment table that is part of the rating schedule referenced in section 4660. The WCAB reasoned that because the rating schedule is prima facie evidence of an injured employee's disability, the diminished future earning capacity adjustment table must be rebuttable. But the WCAB also observed that the diminished future earning capacity adjustment must be rebutted in a manner that comports with section 4660. None of the methodologies used by the WCJ were consistent with section 4660, because none used "a numeric formula based on empirical data and findings" as section 4660 requires.[4] Instead, the WCAB created a new methodology that it considered consistent with section 4660, and was intended to replicate the empirically based method used in the RAND study that established the diminished future earning capacity adjustment in the rating schedule.[5]

---

[3] The three methodologies considered by the WCJ provide background, but differ from the formula applied by the WCAB and challenged in the petitions for review. Under the first method employed by the WCJ, the rating substantiated in the expert vocational reports was reduced by the 25 percent of Ogilvie's disability the parties agreed should be apportioned to prior injuries. This method resulted in a permanent disability rating of 38 to 40 percent. Under the second method, the WCJ calculated Ogilvie's total loss of future earnings based upon the expert testimony, and then reduced it by a third based upon the usual benefit payable for lost wages under section 4658. The resulting wage loss was then compared to the tables to arrive at a corresponding percentage of permanent disability (71.5 percent). This percentage of disability was then reduced due to the prior injuries. The final method considered by the WCJ modified the impairment attributed to Ogilvie's prior knee injury and enhanced her final rating after taking into account the prior injury and her loss of future earnings as estimated by the expert testimony. The result was a 42 percent permanent disability rating.

[4] Section 4660, subdivision (b)(2) states that, "an employee's diminished future earning capacity shall be a numeric formula based on empirical data and findings that aggregate the average percentage of long-term loss of income resulting from each type of injury for similarly situated employees. The administrative director shall formulate the adjusted rating schedule based on empirical data and findings from the Evaluation of California's Permanent Disability Rating Schedule, Interim Report (December 2003), prepared by the RAND Institute for Civil Justice, and upon data from additional empirical studies."

[5] The WCAB's methodology involves using the injured employee's actual postinjury wage data, the wage data for similarly situated noninjured employees over the same period, and the application of some mathematical calculations to yield ratios that can be compared to the diminished future earning capacity ratios in the rating schedule.

A dissenting member of the WCAB concluded that the proper way for an injured employee to rebut the rating schedule would be to rely upon the percentage of lost future earning capacity determined by expert witnesses. The dissent supported its position by saying this approach is in line with the common practice of courts to use such experts to determine earning capacity in civil cases. The majority rejected the dissent's methodology as subjective, nonempirical, and "bear[ing] absolutely no relationship to the statutory scheme" outlined in section 4660, subdivision (b)(2).[6]

On rehearing, the WCAB clarified and affirmed its February 3, 2009 decision. In early October 2009, both Ogilvie and the CCSF filed the petitions for writ of review that are now before this court. While neither party is happy with the WCAB's decision, each party is unhappy for slightly different reasons. Although Ogilvie agrees that one means to rebut the rating schedule may be to challenge the diminished future earning capacity adjustment table, she asserts that another is to challenge the final overall permanent disability rating, which, she asserts, is most accurately done using vocational experts. The CCSF asserts that the WCAB exceeded its authority when it allowed Ogilvie to challenge the diminished future earning capacity adjustment table at all. Since the diminished future earning capacity is defined by statute, the CCSF contends that only the final permanent disability rating may be rebutted by an employee, not one of its component parts like the diminished future earning capacity adjustment.

## DISCUSSION

■ "The touchstone of the workers' compensation system is industrial injury which results in *occupational disability* or death." (*Livitsanos v. Superior Court* (1992) 2 Cal.4th 744, 752 [7 Cal.Rptr.2d 808, 828 P.2d 1195].) California first adopted its system of workers' compensation benefits in 1911. (4 Larson's Workers' Compensation Law (2011) § 80.05[3], p. 80-19 (rel. 104-6/2010).) In 1913, the system was modified to take into account a worker's age and occupation when calculating permanent disability benefits. (4 Larson's Workers' Compensation Law, *supra*, § 80.05[5], p. 80-22 (rel. 104-6/2010).) To this day, age and occupation remain factors in the permanent disability benefit formula. (§ 4660, subd. (a).) Employers are responsible to workers who sustain permanent disabling injuries that arise out of and in the course of their employment. (§ 3600.)

---

[6] The majority noted that the use of vocational experts may be required under its methodology, but that such use would be limited to exceptional cases where information from California's Employment Development Department or other such empirical data is not available.

A permanent disability is the irreversible residual of a work-related injury that causes impairment in earning capacity, impairment in the normal use of a member or a handicap in the open labor market. (*Brodie v. Workers' Comp. Appeals Bd.* (2007) 40 Cal.4th 1313, 1320 [57 Cal.Rptr.3d 644, 156 P.3d 1100].) Payments for permanent disability are designed to compensate an injured employee both for physical loss and reduction in earning capacity. (*Ibid.*) But workers' compensation benefits are not damages awarded due to injury, and are not designed to restore to the worker all he has lost. (*Flores v. Workmen's Comp. Appeals Bd.* (1973) 36 Cal.App.3d 388, 394, fn. 1 [111 Cal.Rptr. 424].) Benefits are designed to rehabilitate, not indemnify. (*Ibid.*) "[T]he workers' compensation system is designed to compensate *only* for such disability or need for treatment as is occupationally related." (*Livitsanos v. Superior Court, supra*, 2 Cal.4th at p. 753.)

"Permanent disability payments are calculated by first expressing the degree of permanent disability as a percentage and then converting that percentage into an award based on a table." (*Brodie v. Workers' Comp. Appeals Bd., supra*, 40 Cal.4th at p. 1320, fn. omitted.) Since 1937, permanent disability awards have been assessed using a schedule that "was always expressly intended to manifest 'prima facie evidence of the percentage of permanent disability to be attributed to each injury covered by the schedule.' (§ 4660, subd. (c).)" (*Milpitas Unified School Dist. v. Workers' Comp. Appeals Bd.* (2010) 187 Cal.App.4th 808, 818 [115 Cal.Rptr.3d 112].)

For many years, determining the degree of permanent disability sustained due to an injury involved consideration of the opinions of vocational rehabilitation specialists concerning the employee's ability to compete in an open labor market. (*Gill v. Workers' Comp. Appeals Bd.* (1985) 167 Cal.App.3d 306 [213 Cal.Rptr. 140].) The employee's ability to compete was an explicit consideration expressed in former section 4660, subdivision (a), which provided: "In determining the percentages of permanent disability, account shall be taken of the nature of the physical injury or disfigurement, the occupation of the injured employee, and his age at the time of such injury, consideration being given to the diminished ability of such injured employee to compete in an open labor market." (Stats. 1993, ch. 121, § 53, p. 1301, eff. July 16, 1993.)

In 2004, the Legislature enacted omnibus changes to California's workers' compensation system as "an urgency measure designed to alleviate a perceived crisis in skyrocketing workers' compensation costs." (*Brodie v. Workers' Comp. Appeals Bd., supra*, 40 Cal.4th at pp. 1323, 1329; see Sen.

Bill No. 899 (2003–2004 Reg. Sess.).) Among them were changes to section 4660, subdivision (a), to require that a permanent disability award give consideration to an injured employee's "diminished future earning capacity," rather than the "ability of such injured employee to compete in an open labor market." (Compare § 4660 (Stats. 2004, ch. 34, § 32, p. 202, eff. Apr. 19, 2004) with former § 4660 (Stats. 1993, ch. 121, § 53, p. 1301, eff. July 16, 1993).)

In addition, section 4660 now requires the administrative director of the Division of Workers' Compensation to amend the schedule for determination of the percentage of permanent disabilities every five years. (§ 4660, subd. (c).) The nature of the physical injury or impairment to be rated in the schedule is to be based upon the American Medical Association's Guides to the Evaluation of Permanent Impairment, and "an employee's diminished future earning capacity shall be a numeric formula based on empirical data and findings . . . prepared by the RAND Institute for Civil Justice . . . ." (§ 4660, subd. (b)(1) & (2).) The schedule is to "promote consistency, uniformity, and objectivity" (§ 4660, subd. (d)), and the scheduled rating continues to be "prima facie evidence of the percentage of permanent disability to be attributed to each injury covered by the schedule" (§ 4660, subd. (c)).

The question posed here is whether, in light of the amendments to section 4660 enacted in Senate Bill No. 899 (2003–2004 Reg. Sess.), it is permissible to depart from a scheduled rating on the basis of vocational expert opinion that an employee has a greater loss of future earning capacity than reflected in a scheduled rating. In order to answer this question, we must consider the effect of amendments to the workers' compensation law contained in Senate Bill No. 899 and the relevant case law that preceded its enactment.

■ In considering this issue, "our goal is to divine and give effect to the Legislature's intent." (*Brodie v. Workers' Comp. Appeals Bd., supra,* 40 Cal.4th at p. 1324.) "[W]e turn to the words in the statute and give effect to the statute according to the usual, ordinary import of the language used in framing it." (*Klee v. Workers' Comp. Appeals Bd.* (1989) 211 Cal.App.3d 1519, 1523 [260 Cal.Rptr. 217].) If the words of a statute are clear and unambiguous, then our inquiry goes no further than their plain meaning. (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].) If possible, we give effect to every word and phrase in order to discern legislative purpose, and we consider the statute in the context of its statutory framework. (*DuBois v. Workers' Comp. Appeals Bd.* (1993) 5 Cal.4th 382, 387–388 [20 Cal.Rptr.2d 523, 853 P.2d 978].) Although our review is de novo, we will give great deference to the WCAB's interpretation of the law unless it is clearly mistaken. (*Genlyte Group, LLC v. Workers' Comp. Appeals Bd.* (2008) 158 Cal.App.4th 705, 714 [69 Cal.Rptr.3d 903].)

Senate Bill No. 899 (2003–2004 Reg. Sess.) amended section 4660 in two ways that affect the issue presented in this proceeding. The statute now provides that "an employee's diminished future earning capacity shall be a numeric formula based on empirical data and findings . . . prepared by the RAND Institute for Civil Justice . . . ." (§ 4660, subd. (b)(2).) And a permanent disability award must now reflect consideration of an injured employee's "diminished future earning capacity" (*id.*, subd. (a)), rather than the "ability of such injured employee to compete in an open labor market." (Former § 4660, subd. (a).) This latter change is readily addressed.

An injured employee's impaired future earning capacity had been a consideration in awarding permanent disability long before the phrase was substituted into section 4660, subdivision (a) by Senate Bill No. 899 (2003–2004 Reg. Sess.). At the time Senate Bill No. 899 was enacted, the established purpose of permanent disability was "to indemnify for impaired future earning capacity or decreased ability to compete in an open labor market." (*Livitsanos v. Superior Court, supra,* 2 Cal.4th at p. 753.) Cases reported prior to Senate Bill No. 899's enactment use the phrases interchangeably. (*Ritchie v. Workers' Comp. Appeals Bd.* (1994) 24 Cal.App.4th 1174, 1179 [29 Cal.Rptr.2d 722]; *Edgar v. Workers' Comp. Appeals Bd.* (1998) 65 Cal.App.4th 1, 10 [76 Cal.Rptr.2d 83]; *Russell v. Bankers Life Co.* (1975) 46 Cal.App.3d 405, 415–416 [120 Cal.Rptr. 627]; *Sidders v. Workers' Comp. Appeals Bd.* (1988) 205 Cal.App.3d 613, 628 [252 Cal.Rptr. 304]; *Franklin v. Workers' Comp. Appeals Bd.* (1978) 79 Cal.App.3d 224, 237–238 [145 Cal.Rptr. 22].) Indeed, the terms "diminished future earning capacity" and "ability to compete in an open labor market" suggest to us no meaningful difference, and nothing in Senate Bill No. 899 suggests that the Legislature intended to alter the purpose of an award of permanent disability through this change of phrase. Nor does its use suggest that a party seeking to rebut a permanent disability rating must make any particular showing.

■ The specification in section 4660, subdivision (b)(2), that an employee's diminished future earning capacity "shall be a numeric formula based on empirical data and findings" as developed by the RAND Institute presents a slightly more difficult question. The language of section 4660 provides no alternative means to take into account the diminished earning capacity of an employee as a factor in rating a permanent disability. While the rating schedule is to be "prima facie evidence of the percentage of permanent disability to be attributed to each injury covered by the schedule" (§ 4660, subd. (c)), there is no indication some other measure may be substituted for the earning capacity component in order to arrive at an overall rating most suitable for a particular employee. In considering the Legislature's intent to

"promote consistency, uniformity, and objectivity" in permanent disability awards, we see nothing ambiguous or unclear in section 4660's directive that the earning capacity adjustment factor "shall be" the numeric formula based upon the RAND Institute's report. It must be initially applied.

Rather, the ambiguity lies in determining just how an employee's overall rating and its component parts may be rebutted while remaining loyal to the Legislature's design to provide a system that is objective and uniform in application. Looking back at over 41 years of case law interpreting section 4660, there appear to be at least two rebuttal methods that are unchanged by passage of Senate Bill No. 899 (2003–2004 Reg. Sess.). First of all, the cases have always recognized the schedule to be rebutted when a party can show a factual error in the application of a formula or the preparation of the schedule. (See *Fidelity & Cas. Co. v. Workmen's Comp. App. Bd.* (1967) 252 Cal.App.2d 327, 335 [60 Cal.Rptr. 442] [rebuttal based on one element of disability being included in the permanent disability rating that should not have been, and another not being included that should have been]; *State of California v. Ind. Acc. Com.* (1954) 129 Cal.App.2d 302, 304 [276 P.2d 820] [schedule's prima facie evidence was rebutted because the injured employee's congenital deaf-mutism was included in the rating as if he had lost his hearing and speech in the industrial accident in which he injured his hand]; *Young v. Industrial Acc. Com.* (1940) 38 Cal.App.2d 250, 255 [100 P.2d 1062] [the schedule did not constitute prima facie evidence because the schedule did not cover the impairment involved]; *National Kinney v. Workers' Comp. Appeals Bd.* (1980) 113 Cal.App.3d 203 [169 Cal.Rptr. 801] [employee's duties required application of a different group].) A challenge to an employee's presumptive disability rating thus appears to remain permissible on the basis that the schedule, or one of its component factors, was incorrectly calculated or applied. Nothing in Senate Bill No. 899 leads us to conclude the Legislature intended to alter the ways a party to a compensation proceeding may challenge a scheduled rating. As our Supreme Court recently remarked of Senate Bill No. 899, " '[w]e do not presume that the Legislature intends, when it enacts a statute, to overthrow long-established principles of law unless such intention is clearly expressed or necessarily implied.' " (*Brodie v. Workers' Comp. Appeals Bd., supra*, 40 Cal.4th at p. 1325.)

The possibility an employee can demonstrate such an error in the earning capacity adjustment factor is more than theoretical, particularly in cases like this one involving a back injury. The RAND Institute for Civil Justice released a working paper in 2004 that describes the methodology employed to arrive at empirical adjustments to disability ratings due to diminished future earning capacity. (RAND Inst. for Civil Justice, Data for Adjusting Disability Ratings to Reflect Diminished Future Earnings and Capacity in Compliance with SB 899 (2004) (Working Paper).) The Working Paper places several caveats on the use of the empirical data relied upon by the RAND

Institute in reaching the earning capacity adjustments. For example, one of the challenges faced by the RAND group was that the .data previously assembled to consider earnings loss attributable to certain injuries was categorized by descriptions used by the California Permanent Disability Rating System, while Senate Bill No. 899 (2003–2004 Reg. Sess.) requires injury descriptions based on the American Medical Association guides. (Working Paper, at p. 7.) The descriptions are quite different in practice, and at the time the future earning capacity adjustments were established, there was no direct link between the data used by RAND and the American Medical Association guides. (*Ibid.*) An ideal system would combine information on earnings losses with actual American Medical Association guide ratings. (*Id.* at p. 14.) The Working Paper also makes certain assumptions that are critical when the diminished earning capacity ratings are applied to back injuries. (*Id.* at pp. 10–12.) If any of the assumptions are incorrect, the estimated ratings could be biased. (*Ibid.*) A challenge to the rating schedule on the basis that there was a factual error in the calculation of one of its component factors, or it was incorrectly applied in a particular case does not undermine the schedule's "consistency, uniformity, and objectivity." (§ 4660, subd. (d).) It merely serves to correct it or ensure its accurate application.

An interpretation that the diminished earning capacity adjustment factor must be applied as formulated by the administrative director in all cases irrespective of its accuracy would require us to read into section 4660 a conclusive presumption. Such a restrictive interpretation of section 4660 would be inconsistent with the Legislature's clear expression that the rating schedule is rebuttable. (See *Milpitas Unified School Dist. v. Workers' Comp. Appeals Bd., supra,* 187 Cal.App.4th 808.)

Another way the cases have long recognized that a scheduled rating has been effectively rebutted is when the injury to the employee impairs his or her rehabilitation, and for that reason, the employee's diminished future earning capacity is greater than reflected in the employee's scheduled rating. This is the rule expressed in *LeBoeuf v. Workers' Comp. Appeals Bd.* (1983) 34 Cal.3d 234 [193 Cal.Rptr. 547, 666 P.2d 989]. In *LeBoeuf,* an injured worker sought to demonstrate that, due to the residual effects of his work-related injuries, he could not be retrained for suitable meaningful employment. (*Id.* at pp. 237–238.) Our Supreme Court concluded that it was error to preclude LeBoeuf from making such·a showing, and held that "the fact that an injured employee is precluded from the option of receiving rehabilitation benefits should also be taken into account in the assessment of an injured employee's permanent disability rating." (*Id.* at p. 243; accord, *Gill v. Workers' Comp. Appeals Bd., supra,* 167 Cal.App.3d 306.) While some of the briefing provided to the court may be read to suggest that under *LeBoeuf* a disability award may be affected when an employee is not amenable to vocational rehabilitation for any reason, the most widely accepted view of its holding,

and that which appears to be most frequently applied by the WCAB, is to limit its application to cases where the employee's diminished future earnings are directly attributable to the employee's work-related injury, and not due to nonindustrial factors such as general economic conditions, illiteracy, proficiency in speaking English, or an employee's lack of education. (See *James v. Workers' Comp. Appeals Bd.* (1986) 51 Cal.Comp.Cases 45 [writ denied]; *Espinoza v. Workers' Comp. Appeals Bd.* (1994) 59 Cal.Comp.Cases 753 [writ denied]; *Southern v. Workers' Comp. Appeals Bd.* (1997) 62 Cal.Comp.Cases 719 [writ denied]; *Gottschalks v. Workers' Comp. Appeals Bd.* (2003) 68 Cal.Comp.Cases 1714 [writ denied]; *Avei v. Workers' Comp. Appeals Bd.* (2004) 69 Cal.Comp.Cases 434 [writ denied]; *Linam v. Workers' Comp. Appeals Bd.* (2007) 72 Cal. Comp. Cases 332 [writ denied]. Cf. *Montiel v. Workers' Comp. Appeals Bd.* (1997) 62 Cal.Comp.Cases 366 [writ denied]; *T & D Tile Co. v. Workers' Comp. Appeals Bd.* (2002) 67 Cal.Comp.Cases 1231 [writ denied]; *University of California, Berkeley v. Workers' Comp. Appeals Bd.* (2007) 72 Cal.Comp.Cases 1421 [writ denied].)[7]

This application of *LeBoeuf* hews most closely to an employer's responsibility under sections 3208 and 3600 to "compensate *only* for such disability or need for treatment as is occupationally related." (*Livitsanos v. Superior Court, supra,* 2 Cal.4th at p. 753.) "Employers must compensate injured workers only for that portion of their permanent disability attributable to a current industrial injury, not for that portion attributable to previous injuries or to nonindustrial factors." (*Brodie v. Workers' Comp. Appeals Bd., supra,* 40 Cal.4th at p. 1321 [discussing apportionment].) An employee effectively rebuts the scheduled rating when the employee will have a greater loss of future earnings than reflected in a rating because, due to the industrial injury, the employee is not amenable to rehabilitation.

The briefs and arguments of the parties and amici curiae also point out a third basis for rebuttal of a scheduled rating that is consistent with the statutory scheme. In certain rare cases, it appears the amalgamation of data used to arrive at a diminished future earning capacity adjustment may not capture the severity or all of the medical complications of an employee's work-related injury. After all, the adjustment is a calculation based upon a summary of data that projects earning losses based upon wage information

---

[7] We recognize that the cited cases are writ-denied summaries of decisions by the WCAB, and have no stare decisis effect. However, the WCAB has approved the citation of writ-denied summaries published in California compensation cases. Accordingly, courts may and do cite them in published decisions. (See, e.g., *Robertson v. Workers' Comp. Appeals Bd.* (2003) 112 Cal.App.4th 893, 899 [5 Cal.Rptr.3d 485].)

obtained from California's Employment Development Department for a finite period and comparing the earnings losses of certain disabled workers to the actual earnings of a control group of uninjured workers. (Working Paper, at p. 3.) A scheduled rating may be rebutted when a claimant can demonstrate that the nature or severity of the claimant's injury is not captured within the sampling of disabled workers that was used to compute the adjustment factor. For example, a claimant who sustains a compensable foot fracture with complications resulting from nerve damage may have greater permanent effects of the injury and thereby disprove the scheduled rating if the sampling used to arrive at the rating did not include any workers with similar complications. In such cases, the scheduled rating should be recalculated taking into account the extent to which the claimant's disability has been aggravated by complications not considered within the sampling used to compute the adjustment factor. In this way, the employee's permanent disability rating gives "consideration" to an employee's diminished earning capacity that remains based upon "a numeric formula based on empirical data and findings . . . prepared by the RAND institute." (§ 4660, subds. (a) & (b)(2).) We leave it to the WCAB in the first instance to prescribe the exact method for such a recalculation that factors the employee's anticipated diminished earning capacity into the data used by the RAND Institute. (See § 300.)

■ Although Senate Bill No. 899 (2003–2004 Reg. Sess.) enacted extensive changes to California's workers' compensation system, the rebuttable presumption in section 4660 was unaltered. "Given the apparent absence of any legislative intent to change the law in this regard, we have no occasion to resort to reliance on the statutory rule of liberality . . ." that is commonly employed to construe ambiguities in the workers' compensation laws to favor the extension of benefits. (*Brodie v. Workers' Comp. Appeals Bd., supra,* 40 Cal.4th at p. 1332.) The result we reach today furthers the Legislature's objectives by ensuring that an injured worker may dispute his or her scheduled rating on the grounds that it does not accurately reflect that worker's true diminished earning capacity due to an industrial injury.

By requiring that a worker's challenge to a scheduled award due to earning capacity be tied to an error in the formula or industrial factors and not other causes, we serve another important policy consideration. An employer who hires or promotes an employee to a position the employee would not appear qualified to perform will bear only the expense related to the employee's future reduction in earnings due to an industrial injury. By ensuring the employer should bear no expense for general factors that may affect the employee's future, there is no economic disincentive for an employer to either hire or promote an employee to a position that would appear to exceed

the employee's qualifications. Were we to hold that an employer takes the employee as he is and is therefore responsible for any loss of earning capacity the employee may have following an injury no matter the cause, we would create a strange disincentive for employers to extend opportunities for employment or advancement.

■ Thus, we conclude that an employee may challenge the presumptive scheduled percentage of permanent disability prescribed to an injury by showing a factual error in the calculation of a factor in the rating formula or application of the formula, the omission of medical complications aggravating the employee's disability in preparation of the rating schedule, or by demonstrating that due to industrial injury the employee is not amenable to rehabilitation and therefore has suffered a greater loss of future earning capacity than reflected in the scheduled rating.

■ Nothing in Senate Bill No. 899 (2003–2004 Reg. Sess.) authorizes or compels the calculation of an alternative diminished earning capacity adjustment factor as the WCAB devised in order to resolve Ogilvie's claim. When it devised this new methodology, the WCAB acted in excess of its authority. The means an employee may use to challenge a scheduled rating due to diminished earning capacity are described in the reported cases that predate Senate Bill No. 899. Here, vocational experts determined that Ogilvie's anticipated loss of future earnings will be greater than reflected in a permanent disability award based on the rating schedule. Because we cannot determine on this record the degree to which the experts may have taken impermissible factors into account in reaching their conclusions, we remand for further proceedings.

## CONCLUSION

■ The application of the rating schedule is not rebutted by evidence that an employee's loss of future earnings is greater than the earning capacity adjustment that would apply to his or her scheduled rating due to nonindustrial factors. Rather, to rebut the application of the rating schedule on the basis that the scheduled earning capacity adjustment is incorrect, the employee must demonstrate an error in the earning capacity formula, the data or the result derived from the data in formulating the earning capacity adjustment. Alternatively, an employee may rebut a scheduled rating by showing that the rating was incorrectly applied or the disability reflected in the rating schedule is inadequate in light of the effect of the employee's industrial injury. We cannot conclude on this record whether Ogilvie can make any such showing.

## DISPOSITION

The decision of the WCAB is reversed, the award of permanent disability benefits to Ogilvie is annulled, and this matter is remanded to the WCAB for further proceedings consistent with our opinion. Each party to bear its own costs.

Pollak, Acting P. J., and Jenkins, J., concurred.

The petition of respondent City and County of San Francisco for review by the Supreme Court was denied October 26, 2011, S196257.