Filed 9/24/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| CONTRA COSTA COUNTY,<br><br>    Petitioner,<br><br>v.<br><br>WORKERS' COMPENSATION<br>APPEALS BOARD and DOREEN DAHL,<br>Respondents. | A141046<br><br>(WCAB No. ADJ1310387) |

    We granted Contra Costa County's (the County) petition for a writ of review, which challenged a Workers' Compensation Appeal Board's (the WCAB) decision awarding Doreen Dahl a permanent disability rating of 79 percent.[1] The workers' compensation judge (the WCJ) initially found, and both parties agree, that Dahl's permanent disability rating as determined by the California Permanent Disability Rating Schedule (the Schedule) is 59 percent. Dahl sought to rebut that rating, invoking *Ogilvie v. Workers' Compensation Appeals Board* (2011) 197 Cal.App.4th 1262 (*Ogilvie*). *Ogilvie* held that there are only three ways in which the scheduled rating for an injured employee may permissibly be rebutted. Dahl sought to invoke the second method approved in *Ogilvie* (the "*LeBoeuf* method")[2] under which the employee shows she "will

---

[1] Four amici have filed briefs in support of the County: California Chamber of Commerce, California Workers' Compensation Institute, California Association of Joint Powers Authorities, and the California State Associations of Counties–Excess Insurance Authority (CSAC-EIA). One amicus, the California Applicants' Attorneys Association (CAAA), has filed a brief in support of Dahl.

[2] The method was approved by the California Supreme Court in *LeBoeuf v. Workers' Compensation Appeals Board* (1983) 34 Cal.3d 234 (*LeBoeuf*).

1

have a greater loss of future earnings than reflected in a rating because, due to the industrial injury, the employee is not amenable to rehabilitation." (*Ogilvie*, 197 Cal.App.4th at p. 1275.) Dahl's "rebuttal," however, included no evidence that the industrial injuries she sustained to her neck and shoulder rendered her incapable of rehabilitation. Rather, her "rebuttal" consisted solely of a vocational expert's opinion that his method for determining Dahl's diminished future earnings capacity produced a higher rating than that of the rating produced by the Schedule and that his method more accurately measured Dahl's diminished future earnings.

Dahl's attempted rebuttal did not comport with any of the methods approved in *Ogilvie* for rebutting the rating provided using the rating schedule and is therefore foreclosed by *Ogilvie*. Accordingly, we reverse the WCAB's decision, and annul the award.

## BACKGROUND

## I.

### *Legal Framework*

The extent of an injured workers' compensation applicant's permanent disability is assessed by reference to the statutorily defined Schedule. (Lab. Code § 4660, subd. (d).)[3] The Schedule consists of four components: (1) the nature of the physical injury or disfigurement; (2) the occupation of the applicant; (3) the age of the applicant; and (4) the applicant's diminished future earnings capacity. (§ 4660, subd. (a).) "The nature of the physical injury or impairment to be rated in the schedule is to be based upon the American Medical Association's Guides to the Evaluation of Permanent Impairment, and 'an employee's diminished future earning capacity shall be a numeric formula based upon empirical data and findings . . . prepared by the RAND Institute for Civil Justice . . . .' (§ 4660, subd. (b)(1) & (2).) The schedule is to 'promote consistency, uniformity, and objectivity,' (§ 4660, subd. (d)), and the scheduled rating is 'prima facie

---

[3] All future statutory references are to the Labor Code unless otherwise specified.

evidence of the percentage of permanent disability to be attributed to each injury covered by the schedule.' (§ 4660, subd. (c).)." (*Ogilvie*, *supra*, 197 Cal.App.4th at p. 1271.)

In *Ogilvie*, Division Three of this court addressed "whether, in light of the amendments to section 4660 enacted in Senate Bill No. 899 [in 2004], it is permissible to depart from a scheduled rating on the basis of vocational expert opinion that an employee has a greater loss of future earning capacity than reflected in a scheduled rating." (*Ogilvie*, *supra*, 197 Cal.App.4th at p. 1271.) Giving consideration to the purpose behind and the language of the amendments, the *Ogilvie* court answered this question with a qualified "yes." It held that there are three permissible methods by which the scheduled rating could be rebutted.

First, the court concluded that the Legislature left unchanged the case law allowing "the schedule to be rebutted when a party can show a factual error in the application of a formula or the preparation of the schedule." (*Ogilvie*, *supra*, 197 Cal.App.4th at p. 1273.) Second, the Legislature also left intact the cases, including *LeBoeuf*, recognizing "that a scheduled rating has been effectively rebutted . . . when the injury to the employee impairs his or her rehabilitation, and for that reason, the employee's diminished future earning capacity is greater than reflected in the employee's scheduled rating." (*Ogilvie*, *supra*, 197 Cal.App.4th at p. 1274.) The court interpreted *LeBoeuf* and its progeny as limited in application "to cases where the employee's diminished future earnings are directly attributable to the employee's work-related injury, and not due to nonindustrial factors." (*Id*. at pp. 1274–1275.) Third and finally, the court held "[a] scheduled rating may be rebutted when a claimant can demonstrate that the nature or severity of the claimant's injury is not captured within the sampling of disabled workers that was used to compute the adjustment factor." (*Id*. at p. 1276.)

In *Ogilvie*, Ogilvie and her employer each submitted estimates of her diminished future earning capacity from vocational rehabilitation experts who compared her earnings before the injury with what she could be expected to earn after it. "Each expert considered his evaluation to be superior to the scheduled rating because he considered such things as Ogilvie's education, skills, motivation, local job market conditions, work

3

history, and vocational testing in arriving at Ogilvie's loss of earning capacity." (*Ogilvie*, *supra*, 197 Cal.App.4th at p. 1267.) The WCJ agreed that the scheduled rating did not sufficiently compensate her and set about devising his own methodologies. (*Id*. at pp. 1267–1268.) The WCAB created yet another methodology "that it considered consistent with section 4660, and was intended to replicate the empirically based method used in the RAND study that established the diminished future earning capacity adjustment in the rating schedule." (*Id*. at p. 1268)

On writ review, this court rejected the WCAB methodology, holding "[n]othing in the Senate Bill No. 899 authorizes or compels the calculation of an alternative diminished earning capacity adjustment factor as the WCAB devised in order to resolve Ogilvie's claim. When it devised this new methodology, the WCAB acted in excess of its authority. The means an employee may use to challenge a scheduled rating due to diminished earning capacity are described in the reported cases that predate Senate Bill No. 899." And although the parties' "vocational experts determined that Ogilvie's anticipated loss of future earnings will be greater than reflected in a permanent disability award based on the rating schedule," the court remanded for further proceedings because it could "not determine on this record the degree to which the experts may have taken impermissible factors into account in reaching their conclusions." (*Ogilvie*, *supra*, 197 Cal.App.4th at p. 1277.)

## II.

### *Factual and Procedural History*

During a period that ended in March 2005, Dahl sustained a cumulative industrial injury to her neck and right shoulder while employed by the County as a medical records technician. The injuries resulted in surgeries and scarring. At the time of the injuries, she was 49 years old and had worked for the county for over 8 years. Dahl has a bachelor's degree from CSU Hayward and a felony conviction for possession and sale of methamphetamine.

4

The parties' Agreed Medical Examiner (AME), Dr. Mechel Henry, found no basis for apportionment,[4] and the parties agreed that she correctly evaluated the whole person impairment (WPI) caused by Dahl's injury in accordance with the AMA Guides as required by statute. They also agreed that the WPI found by Henry resulted in a rating of 59 percent disability. However, Dahl sought to rebut the scheduled rating through a vocational expert (Jeffrey Malmuth), and the County sought to counter that with its own expert (Ira Cohen).

It does not appear Dahl sought to employ either the first rebuttal method approved in *Ogilvie* (factual error in application of a formula or preparation of the schedule) or the third (nature or severity of claimant's injury not captured within sampling of disabled workers used to compute the adjustment factor). Thus, the WCJ found "no evidence that [Dahl's] impairments or the disability ratings derived from them are either mathematically incorrect or medically deviant from the injuries enumerated in the Guides or the rating schedule." Rather, Dahl sought to invoke the second *Ogilvie* rebuttal method. As the WCJ noted, Dahl's expert and the County's "produced reports and trial testimony offering various conflicting percentages of lost earning capacity, leading to various permanent disability ratings."

At the evidentiary hearing in March 2011, Malmuth testified that he relied on the medical opinions of Dr. Henry that Dahl has pain and cervical and upper extremity limitations but acknowledged that Dahl has some earning capacity. He testified that her ability to get a job is affected by factors other than her injury. He opined that Dahl "cannot compete successfully with uninjured job applicants, given the entire constellation of factors, despite having some earning capacity."

Malmuth did his own calculations regarding Dahl's diminished future earning capacity. He "attempted to establish a DFEC [diminished future earnings capacity] based

---

[4] " 'Apportionment is the process employed by the Board to segregate the residuals of an industrial injury from those attributable to other industrial injuries, or to nonindustrial factors, in order to fairly allocate the legal responsibility.' " (*Brodie v. Workers' Comp. Appeals Bd.* (2007) 40 Cal.4th 1313, 1321.)

not on applicant's individual assets and detriments but on those of a theoretical group of 'similarly situated employees.' " He "compared the earning ability of similarly-situated employees against that of this employee." "The jobs he studied were based on the conclusions reached by Dr. Henry." The limitations involving Dahl's shoulder led to limitations in the labor market Malmuth considered. Malmuth testified that Dahl was earning $25.56 per hour at the time of her injury, which would be between the 75th and 90th percentile for employees in the category he considered similar. Her post-injury earning capacity would be limited to the 50th percentile of wages or below "because of her work-related medical condition," which caused him to use the "average" figure of $9.13 per hour for her post-injury earning capacity. Malmuth opined that "the most accurate measure of [Dahl's] lost earning capacity" was about 87 percent. He considered Dahl's education, but opined that jobs that would use her education were precluded by her injury because of her limitations including her inability to use a computer. On cross-examination, he testified that she would be helped by vocational rehabilitation, including voice recognition and other things. He acknowledged that Dahl was a good rehabilitation candidate and could go to school and get a master's degree. She could employ vocational rehabilitation to have access to more of the labor market, and if she did her earning capacity would rise.

The County's vocational expert (Cohen) agreed with Malmuth that Dahl "would benefit from vocational rehabilitation," get a master's degree and "raise her earning capacity." He disagreed with Malmuth's calculation of Dahl's earning capacity. He criticized Malmuth for treating plaintiff as unskilled, focusing on too few job areas, failing to account for her skills or aptitude and using too low a percentile regarding her potential wages. Dahl "could do more jobs than Mr. Malmuth indicates." Cohen used the code for a bachelor's degree in evaluating her earning capacity. He reviewed her medical and other records, physical limitations, educational history, vocational history, AME evaluation, deposition, payroll records from the County, performed vocational testing and interviewed Dahl. Taking into account all of this information and her age, education, skills, aptitude, the general condition of the labor market and occupations

6

compatible with her profile, he opined that her proportional earnings loss due to the injury was 30 percent. According to Malmuth, Cohen's earnings loss percentage would result in a disability rating of about 77 percent.

The Workers' Compensation Judge (WCJ) determined that Dahl's injury caused a permanent disability of 59 percent pursuant to the Schedule. The WCJ held that, under *Ogilvie*, Dahl failed to rebut her diminished future earning capacity factor because she could not show her injury caused a total loss of future earning capacity or 100 percent permanent disability. The WCJ did not address whether she would have met her rebuttal burden if *Ogilvie* permitted a loss of future earning capacity less than 100 percent.

On appeal from this decision, the WCAB agreed with the WCJ that there was no evidence to support rebuttal under the first or third *Ogilvie* methods. However, it rejected the WCJ's interpretation of *Ogilvie*, and held that Dahl could rebut the scheduled rating by showing the injury impaired her amenability to rehabilitation, even where there was less than total permanent disability. For this reason, it rescinded the WCJ's findings and award and "return[ed] the case to the trial level for development of the record and a new decision on whether applicant's rebuttal of the DFEC supports a finding of permanent disability that is higher than calculated under the PDRS [rating schedule]."

On remand, the WCJ heard additional testimony from the same two vocational experts on whether the diminished future earning capacity rating properly reflected Dahl's future earning capacity. Malmuth again testified that Dahl was a good rehabilitation candidate. Nonetheless, he attempted to establish Dahl's future earning capacity based not on her individual assets and detriments, but on those of a theoretical group of similarly situated employees. According to Malmuth, this approach precluded consideration of Dahl's education. He opined that the scheduled rating understated her loss of future earning capacity.

Cohen again adopted a more individualized approach, though he declined to consider Dahl's felony conviction. He concluded that Dahl's scheduled rating actually overstated her loss of future earning capacity.

7

The WCJ found Cohen's conclusions were now contrary to the law of the case. The judge reasoned the WCAB had already ruled that Dahl showed she had a greater diminished earning capacity than reflected in the scheduled rating. The WCJ also found Malmuth's method more persuasive than Cohen's because it eliminated from the diminished future earning capacity calculation any impermissible factors not stemming from Dahl's industrial injury. The WCJ assigned Dahl's right shoulder impairment a score of 64 percent, and taking into account her other injuries, assigned Dahl a total permanent disability of 79 percent. In the belief that the WCAB had already decided the issue, the WCJ did not consider whether Dahl had shown that her injury impaired her prospects for vocational rehabilitation, much less whether any such impairment caused her to suffer a greater loss of future earning capacity as required by *Ogilvie*. (*Ogilvie*, *supra*, 197 Cal.App.4th at pp. 1274–1275, 1277.)

The County appealed to the WCAB through a petition for reconsideration. The WCAB affirmed. In doing so, it again concluded that "complete lack of amenability to vocational rehabilitation" is not "necessary before a *LeBoeuf* analysis may be properly applied." The WCAB also accepted Malmuth's method for determining Dahl's diminished future earning capacity (accepted by the WCJ) of "look[ing] at the effect such an injury [as Dahl's] would have upon the DFEC of similarly situated workers" as consistent with *Ogilvie*. The WCAB opinion does not discuss what evidence, if any, including Malmuth's computations, demonstrated that Dahl's injury impaired her amenability to rehabilitation, much less that such impairment was the cause of greater loss of earning capacity than the scheduled rating reflected.

The County subsequently petitioned for a writ of review, which we granted.

**DISCUSSION**

The County argues the WCJ and WCAB erred by straying from the scheduled rating established by the Schedule. The County concedes that, under *Ogilvie*, Dahl could rebut her scheduled rating by showing her injury precluded vocational rehabilitation but contends the WCAB completely ignored evidence Dahl was amenable to rehabilitation. The County and various amici also take issue with the manner in which the WCAB

8

calculated Dahl's diminished future earning capacity, as well as her revised rating. We agree that Dahl failed to rebut her scheduled rating by showing her injury precluded vocational rehabilitation. Accordingly, we need not and do not reach the other arguments raised by the County and amici.

Our review is limited to determining whether the WCAB acted "without or in excess of its powers" and whether its decision was unreasonable, not supported by substantial evidence or procured by fraud. (§ 5952, subds. (a)–(d).) We may also determine if findings of fact support the order. (§ 5952, subd. (e).) "The findings and conclusions of the appeals board on questions of fact are conclusive and final and are not subject to review." (§ 5953.) "[U]nless clearly erroneous[,] the WCAB's interpretation of the workers' compensation laws is entitled to great weight." (*Genlyte Group., LLC v. Workers' Comp. Appeals Bd.* (2008) 158 Cal.App.4th 705, 714.) Nevertheless, issues of statutory interpretation and questions of law are subject to our independent review, and we need not defer to the WCAB's legal determinations where they are contrary to the plain meaning of the statute or prevailing case law. (See *ibid.*)

As all parties acknowledge, the resolution of this case turns on *Ogilvie*. In that case, the WCAB found a workers' compensation applicant could rebut his diminished future earning capacity adjustment by proposing an alternative earning capacity, so long as the applicant used a numeric formula based on empirical data and findings. (*Ogilvie*, *supra*, 197 Cal.App.4th at p. 1268.) After granting a petition for review, our colleagues in Division 3 found the WCAB had erred because, under the 2004 amendments to the workers' compensation scheme, the statutory rating schedule "is to be 'prima facie evidence of the percentage of permanent disability to be attributed to each injury covered by the schedule' (§ 4660, subd. (c))." (*Id.* at p. 1272.) There was "no indication some other measure may be substituted for the earning capacity component in order to arrive at an overall rating most suitable for a particular employee." (*Ibid.*) The court suggested the WCAB's approach was contrary to the purpose of the amendments, which was to " 'alleviate a perceived crisis in skyrocketing workers' compensation costs' " and to " 'promote consistency, uniformity, and objectivity.' " (*Id.* at pp. 1270–1273.)

9

While the statutory Schedule was presumptively correct, the court held it could be rebutted using methods recognized prior to the 2004 amendments. (*Ogilvie*, *supra*, 197 Cal.App.4th at p. 1273.) Nothing in the statutory text or legislative history indicated the Legislature intended " 'to overthrow [these] long-established principles of law.' " (*Ibid.*) The court identified three such methods. (*Id.* at p. 1277.) First, an employee could rebut the scheduled rating by showing a factual error in the application of a formula or the preparation of the schedule. (*Id.* at p. 1273.) Second, the employee could show "the injury . . . impairs his or her rehabilitation, and for that reason, the employee's diminished future earning capacity is greater than reflected in the employee's scheduled rating." (*Id.* at p. 1274.) Third, in certain rare cases, an employee may show the amalgamation of data used to arrive at a diminished future earning capacity do not capture the severity of all of the medical complications of an employee's work-related injury. (*Id.* at p. 1275.)

The court derived the second method from our Supreme Court's opinion in *LeBoeuf*, *supra*, 34 Cal.3d 234. (*Ogilvie*, *supra*, 197 Cal.App.4th at p. 1274.) In *LeBoeuf*, the claimant, who had been awarded 60 percent permanent disability, moved to reopen his compensation proceedings based on the Bureau of Rehabilitation's finding that he would be unable to return to suitable gainful employment through vocational rehabilitation services. (*LeBoeuf*, *supra*, 34 Cal.3d at pp. 238–240.) The WCJ and WCAB denied his request. (*Id.* at p. 240.) The court found this was error, stating: "Just as retraining may increase a worker's ability to compete in the labor market, a determination that he or she cannot be retrained for any suitable gainful employment may adversely affect a worker's overall ability to compete. Accordingly, that factor should be considered in any determination of a permanent disability rating." (*Id.* at p. 243.)

In *Ogilvie*, the court concluded the *LeBoeuf* approach was limited to cases "where the employee's diminished future earnings are directly attributable to the employee's work-related injury, and not due to nonindustrial factors such as general economic conditions, illiteracy, proficiency in speaking English, or an employee's lack of education." (*Ogilvie*, *supra*, 197 Cal.App.4th at p. 1275.) "This application of *LeBoeuf* hews most closely to an employer's responsibility . . . to 'compensate *only* for such

10

disability or need for treatment as is occupationally related.' " (*Ibid.*) In support, the court cited to a number of workers' compensation cases dealing with an employee's ability to rehabilitate. (*Ibid.*) In most of these cases, the WCAB denied claimants' petitions for reconsideration because their inability to benefit from rehabilitation was due, at least in part, to pre-existing nonindustrial factors that had nothing to with their injuries.[5]

Dahl's attempt to rebut her disability rating bears little resemblance to any of the methods described in *Ogilvie*, including the rebuttal method derived from *LeBoeuf*. Dahl did not explain how her injury prevented her from participating in vocational rehabilitation. In fact, Dahl's own vocational expert conceded that she was a good rehabilitation candidate and also stated a discussion of vocational rehabilitation was "irrelevant." The gravamen of Dahl's rebuttal is that her expert's analysis of the earning capacity—based on the earnings loss of a group of individuals that the expert identified as more similarly situated to Dahl than the group identified in the Schedule for someone with her characteristics—is superior to the method and rating called for by the statute. This approach is at odds with *Ogilvie*, which rejected a similar attempt to simply substitute a vocational expert's or judge- or board-preferred methodology for the statutorily prescribed rating system. *Ogilvie* signaled that it would be a rare case in which an applicant or employer could rebut a scheduled rating. Yet under the WCAB's approach here, claimants would be permitted to rebut their scheduled rating in virtually all cases where an expert can provide a statistical analysis of a group of individuals he or she claims is more similarly situated to the applicant than that identified in the Schedule. As amicus curiae California Association of Joint Powers Authorities points out, the

---

[5] See *James v. Workers' Compensation Appeals Bd.* (1986) 51 Cal.Comp.Cases 45 (writ denied); *Espinoza v. Workers' Compensation Appeals Bd.* (1994) 59 Cal.Comp.Cases 753 (writ denied); *Southern v. Workers' Compensation Appeals Bd.* (1997) 62 Cal.Comp.Cases 719 (writ denied); *Avei v. Workers' Compensation Appeals Bd.* (2004) 69 Cal.Comp.Cases 434 (writ denied); *Linam v. Workers' Compensation Appeals Bd.* (2007) 72 Cal.Comp.Cases 332 (writ denied).

"control groups of 'similarly situated' employees" set forth in the Schedule "provide[] the 'consistency, uniformity and objectivity' " that the Legislature sought to promote.

The first step in any *LeBoeuf* analysis is to determine whether a work-related injury precludes the claimant from taking advantage of vocational rehabilitation and participating in the labor force. This necessarily requires an individualized approach. For example, in *Gottschalks v. Workers' Compensation Appeals Board* (2003) 68 Cal.Comp.Cases 1714, 1716 (writ denied), one of the compensation cases cited in *Ogilvie*, the WCAB denied an employer's petition for reconsideration of a 100-percent disability rating where Oxycontin, a medication used to treat the claimant's industrial injury, had a " 'severe [e]ffect' " on the claimant's ability to work. The focus was on the limitations flowing from the claimant's particular condition, not the earning potential of similarly situated individuals who might be subject to different limitations. It is this individualized assessment of whether industrial factors preclude the employee's rehabilitation that *Ogilvie* approved as a method for rebutting the Schedule. The *Ogilvie* court did not sanction rebuttal of the statutory Schedule by a competing empirical methodology—no matter how superior the applicant and her expert claim it may be.

In this case, the County presented evidence Dahl's injury did *not* prevent her from taking advantage of retraining opportunities or finding another job. Dahl's medical evaluator has not provided any formal work restrictions. Moreover, Cohen, the County's vocational expert, concluded Dahl had the ability to work in selected occupations in the open labor mark, including sedentary, semi-sedentary and light work positions. Cohen also found Dahl possessed above-average problem solving, reading, spelling and arithmetic skills, commensurate with the college degree she earned in 2003, indicating she has the cognitive ability to perform any of the occupations for which her college degree prepared her.

Malmuth, Dahl's vocational expert, did not present contrary evidence. He testified Dahl had at least some earning capacity, and concluded there was no medical evidence she could not work eight hours per day. When asked if Dahl was an ideal candidate for rehabilitation, Malmuth responded that, with some training, including voice recognition

12

and other things, "she would be helped." Malmuth further testified Dahl performed "very well" on testing, and that her college education could increase her earning capacity. Malmuth also opined that, even with her injury, Dahl could perform certain jobs without retraining.

Nevertheless, Malmuth concluded Dahl is not amenable to rehabilitation because it would not restore her, or a similarly situated worker, to full pre-injury earning capacity. But this is precisely what the statutory formula for diminished future earning capacity factor is intended to capture. Most work-related injuries that qualify an employee for workers' compensation benefits reduce earning potential to some degree. Thus, allowing a claimant to rebut his or her permanent disability rating through a showing of some diminished future earning capacity would render the statutory formula virtually meaningless. Nothing in *Ogilvie* or any of the case law on which it relies suggests departure from the statutory rating system is permissible whenever an employee cannot be returned to his or her pre-injury earning capacity.

Based on this record, there was no basis for the WCJ or the WCAB to conclude Dahl had rebutted her scheduled diminished future earning capacity by showing she was not amenable to vocational rehabilitation. In fact, it appears no such finding was made in the proceedings below. The WCJ initially held Dahl could not rebut her scheduled rating because she failed to show her injury resulted in a total loss of earning capacity. On a petition for review, the WCAB disagreed that rebuttal based on a claimant's ability to rehabilitate was only available in cases involving 100-percent total permanent disability. The WCAB accepted Dahl's contention "that a *LeBoeuf* type of analysis may be properly applied . . . when it is shown that the injury impairs the employee's rehabilitation, as in this case." However, the WCAB did not refer to any specific evidence that would support such a finding as to Dahl's rehabilitation prospects. On remand, the WCJ held the WCAB's decision after reconsideration conclusively established Dahl had rebutted the scheduled rating but did not identify any evidence showing Dahl's injuries precluded rehabilitation. We disagree.

13

The WCJ relied on the language, which we have italicized, from the following paragraph of the WCAB decision: "Application of a *LeBoeuf* type of analysis in cases of partial permanent disability requires expert opinion on the effect of the injury's impairment on the worker's amenability to rehabilitation and the effect of that on DFEC. Such an analysis can be done even where there is less than total permanent disability, as in this case where the employee *has rebutted the PDRS by showing that she will have a greater DFEC than reflected in the PDRS rating*." This language, while less than clear, does not reflect a finding that Dahl had already met her burden; it indicates only that the WCAB viewed it as permissible for her to meet her burden without claiming to be 100-percent disabled. Indeed, as indicated above, the WCAB remanded for further development of the record to ascertain *whether* Dahl's rebuttal showing supported a finding of disability greater than her scheduled disability—i.e., whether she had satisfied the second method approved in *Ogilvie* for rebutting her scheduled rating. (See *Ogilvie*, *supra*, 197 Cal.App.4th at p. 1277 ["we conclude that an employee may challenge the presumptive scheduled percentage of permanent disability prescribed to an injury . . . by demonstrating that due to industrial injury the employee is not amenable to rehabilitation and therefore has suffered a greater loss of future earning capacity than reflected in the scheduled rating"].) The WCAB thus remanded the case not because it concluded Dahl had already made that showing, but to allow the WCJ to determine whether she had done so.

We are skeptical of WCAB's conclusion that an employee may invoke the second *Ogilvie* rebuttal method where the inability to rehabilitate results in less than a 100-percent permanent disability.[6] However, we need not decide this issue since the County

_____

[6] For the same reason as the rule advocated by Malmuth allowing rebuttal whenever an employee shows she cannot be expected to earn the same as she did prior to injury, a partial impairment rule would allow for rebuttal in a wide swath of cases. Many injured employees cannot return to the precise position they held before their injury or to an equally remunerative one. *Ogilvie* does not appear to contemplate rebuttal of the scheduled rating in this circumstance, since the Schedule's formula for determining diminished future earning capacity takes into account such limitations. Notably, the two

14

did not seek a writ from the WCAB decision adopting the partial impairment rule. In any event, even if an employee's ability to rehabilitate need only be impaired (and not eliminated) in order to rebut the schedule, Dahl failed to make such a showing here. As discussed above, both Dahl and the County's rehabilitation experts agreed Dahl was a good rehabilitation candidate, and the evidence suggests she can increase her earning potential through retraining. There is no evidence that the injury even limited her rehabilitation prospects.

Dahl argues she successfully rebutted the scheduled rating because the state ceased providing a vocational rehabilitation program for injured workers as of January 1, 2003. We disagree. As the County points out, section 4658.5 does provide for workers' compensation vouchers that may be used to pay tuition and other expenses required for retraining. Specifically, the statute provides that an injured employee who does not return to work for the employer within 60 days of the termination of temporary disability shall be eligible for a voucher for education-related retraining or skill enhancement at a state-approved or accredited school. (§ 4658.5, subd. (b).) For disability awards between 50 and 99 percent, the voucher may be up to $10,000. (§ 4658.5, subd. (b)(4).) The applicant in *Ogilvie* was presumably eligible for identical benefits, as this provision was last amended in 2003. Moreover, *Ogilvie* holds claimants must show they are not amenable to rehabilitation due to their industrial injury, not due to extraneous factors, such as the cessation of certain state-sponsored rehabilitation benefits. (*Ogilvie*, *supra*, 197 Cal.App.4th at pp. 1274–1275.) To hold otherwise would mean every employee could now rebut their scheduled rating using a *LeBoeuf* analysis, turning a limited exception into the general rule. There is no indication *Ogilvie* intended the second rebuttal method to be so broad and all-encompassing.

---

cases cited by *Ogilvie* which found claimants were unable to rehabilitate involved injuries that rendered the claimants unable to return to *any* type of gainful employment. (See *LeBoeuf*, *supra*, 34 Cal.3d at pp. 239–240; *Gottschalks v. Workers' Compensation Appeals Bd.*, *supra*, 68 Cal.Comp.Cases at p.1716.)

15

In sum, we find WCAB's approach in this case flies in the face of *Ogilvie* and the 2004 amendments to the workers' compensation scheme. Under the 2004 amendments, a claimant's scheduled rating is presumptively correct. *Ogilvie* confirmed the Legislature meant what it said, and that claimants may not rebut their disability rating merely by offering an alternative calculation of their diminished future earning capacity. While *Ogilvie* found the 2004 amendments did not overthrow certain long-held approaches to calculating earning capacity, it clearly did not intend those approaches to be construed so broadly as to return us to the ad-hoc decision making that prevailed prior to 2004. Following the WCAB's approach in this case would do just that. Claimants could rebut their presumptively correct disability rating merely by presenting an analysis that shows a greater diminished future earning capacity than that determined by applying the Schedule. As *Ogilvie* makes clear, this approach is no longer permissible.

## DISPOSITION

The decision of the WCAB is annulled. We remand for further proceedings consistent with this decision.

                                                         _____

                                                         STEWART, J.

We concur.


_____

KLINE, P.J.


_____

RICHMAN, J.

*Contra Costa County v. Workers' Compensation Appeals Board (Dahl)* (A141046)

Counsel:

Thomas, Lyding, Cartier, & Gaus, Mark A. Cartier for Petitioner.

Lenahan, Lee, Slater & Pearse and Tiffany D. Corona for California State Association of Counties–Excess Insurance Authority as Amicus Curiae on behalf of Petitioner.

Finnegan, Marks, Theofel & Desmond and Ellen Sims Langille for California Chamber of Commerce as Amicus Curiae on behalf of Petitioner.

Law Offices of Allweiss & McMurtry and Michael A. Marks for California Workers' Compensation Institute as Amicus Curiae on behalf of Petitioner.

Mullen & Filippi and Edward L. Hummer for California Association of Joint Powers Authorities as Amicus Curiae on behalf of Petitioner.

Department of Industrial Relations/Workers' Compensation Appeals Board, Neil P. Sullivan and James T. Losee for Respondent Workers' Compensation Appeals Board.

Boxer & Gerson, Arjuna Farnsworth for Respondent Doreen Dahl.

Gearheart & Otis, Mark E. Gearheart for California Applicants' Attorneys Association as Amicus Curiae on behalf of Respondent Doreen Dahl.